PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 11-3250
_____

RODERICK JOHNSON,
Appellant

v.

LOUIS FOLINO, SUPERINTENDENT;
THE DISTRICT ATTORNEY OF THE
COUNTY OF BERKS;
THE ATTORNEY GENERAL OF THE
COMMONWEALTH OF PENNSYLVANIA;
_____

Appeal from the United States District Court
for the Eastern District of Pennsylvania
(D.C. Civil No. 2-04-cv-02835)
District Judge: Honorable Eduardo C. Robreno
_____

Argued September 18, 2012

Before: SLOVITER, RENDELL
and HARDIMAN, Circuit Judges

(Opinion Filed: January 16, 2013)

_____

Samuel J.B. Angell, Esq.
Michael Gonzales, Esq.
David L. Zuckerman, Esq.    **[ARGUED]**
Federal Community Defender Office for
The Eastern District of Pennsylvania
Capital Habeas Unit
601 Walnut Street
The Curtis Center, Suite 545 West
Philadelphia, PA  19106
   *Counsel for Appellant*

Andrea F. McKenna, Esq.    **[ARGUED]**
Office of Attorney General of Pennsylvania
Strawberry Square, 15th Floor
Harrisburg, PA  17120

Douglas J. Waltman, Jr., Esq.
Berks County Office of District Attorney
633 Court Street
Berks County Courthouse, 6th Floor
Reading, PA 19601
   *Counsel for Appellees*

_____

OPINION OF THE COURT
_____

RENDELL, <u>Circuit Judge</u>.

Roderick Johnson filed multiple petitions under Pennsylvania's Post-Conviction Relief Act ("PCRA"), 42 Pa.

Cons. Stat. §§ 9541-9546, unsuccessfully claiming that violations of *Brady v. Maryland*, 373 U.S. 83 (1963), undermined his conviction for first-degree murder. He then sought habeas corpus relief in the United States District Court for the Eastern District of Pennsylvania on the same basis, and, having been denied relief there, he has appealed to our court.

Johnson had been convicted and sentenced to life in prison without any physical evidence or eyewitness testimony tying him to the crime. The testimony of George Robles, a "friend" of Johnson's, that Johnson had confessed his guilt to him, was clearly pivotal to the case. What makes this case unusual is that it was not until discovery in Johnson's federal habeas case that substantial previously undisclosed evidence was uncovered and revealed that at the time Robles testified, he was under investigation for his role in a shooting, an assault, and multiple shots-fired incidents. The undisclosed evidence also showed that Robles, who was never arrested or charged for any crimes despite his having had repeated dealings with the police in investigations involving guns and drugs, did in fact supply the police with information concerning an unrelated crime when his own involvement in an assault came under investigation. The jury never heard any of this impeachment evidence because when Johnson sought discovery of all information in the possession of the local police concerning any criminal activity of Robles, charged or uncharged, the District Attorney who prosecuted Johnson represented to the state court that it had no information or police reports naming Robles as a suspect—a patent misrepresentation.

The District Court denied Johnson's petition concluding that the undisclosed evidence would not have been admissible at Johnson's murder trial and thus could not establish a *Brady* violation. We believe that this case deserves a more thorough and exacting evaluation and for the reasons set forth below, we will reverse and remand for further proceedings consistent with this opinion.

## I.    Factual Background and Procedural History

### A.    Pre-trial

On the evening of November 1, 1996, Jose Bernard Martinez was shot to death in Reading, Pennsylvania. The police discovered Martinez later that evening after an eye-witness, Pearl Torres, reported seeing a man chase down and shoot another man along Schuylkill Avenue in Reading. Torres described the shooter as a black man wearing dark clothes, jeans, and a checkered jacket, but was unable to identify the shooter.

In the weeks following the shooting, the Reading police approached George Robles seeking information about the shooting. He denied any knowledge of the incident. They also interviewed Mylta Velazquez, Johnson's live-in girlfriend, who similarly denied possessing any information. As the investigation continued, the police returned to Robles repeatedly, interviewing him between six and twelve times. Again and again, Robles claimed to have no knowledge of the shooting.

Finally, on December 17, 1996, Robles, indicating that his "consci[ence] was killing [him]," relented and gave the

4

police a statement implicating Johnson and Richard Morales in the murder of Martinez. (JA 943). Robles told investigators that Johnson had come straight to his home after the shooting and confessed to his involvement. According to Robles, Johnson admitted to confronting Martinez at a Getty's Mart about a debt Martinez owed Johnson's friend David, firing his gun twice in the store, chasing down Martinez in a van because he fled when Johnson's gun jammed, and then shooting Martinez in the street. Robles told the police that Johnson said that he bumped into a girl after the shooting and mistaking her for Morales, yelled to her that he had just "killed that guy." (JA 510). Robles also informed the investigators that Morales turned up at his home about 15 minutes after Johnson left and confirmed Johnson's account of the shooting. Morales apparently added that he had fired an additional shot at Martinez after Johnson fled to ensure that Johnson had "finished the job." (*Id.*).

On the same day that Robles recanted his denials, Shannon Sanders came forward to give a statement to the police. Sanders told the investigators that on the night of the shooting she had been walking in an alley in the immediate vicinity of Schuylkill Avenue when she encountered a dark-skinned man dressed in baggy clothes and carrying a 9-millimeter semiautomatic handgun. The man spontaneously confessed that he had just shot a man. Sanders, who was an acquaintance of Johnson's, could not identify the man she encountered, despite having seen his face. Although Sanders waited six weeks before speaking with investigators, she recounted her story to numerous family and friends, including Velazquez, in the meantime.

Three days after Robles and Sanders gave their statements, Velazquez retracted her denial as well, telling the police that Johnson, now her ex-boyfriend, had confessed to killing Martinez as part of a hit. In her police statement, Velazquez denied ever having seen Johnson with a gun.

Thereafter, Richard Morales and Roderick Johnson were arrested and charged in connection with the murder of Martinez.

In February 1997, George Robles was arrested as a material witness after failing to appear in court to testify against Johnson. Robles was incarcerated for approximately two months in Berks County Prison as a result. During his incarceration—Robles's first—he wrote a letter to Detective Cabrera of the Reading Police asking to be released early and offering to "do anything" in exchange. (JA 979-80). Robles was released from prison only after he testified at the preliminary hearing.

On September 13, 1997, more than ten months after the shooting, Luz Cintron, Robles's girlfriend, approached the investigators with her knowledge of the shooting. Cintron told police that the night of the shooting Morales had turned up at Robles's home where Cintron overheard him telling Robles that he and Johnson had seen Martinez at an IGA and that Johnson had confronted him about money he owed their friend Shaun Bridges. Cintron also claimed that Morales said that when Martinez ran, Johnson took off chasing him on foot, eventually catching him and shooting him in the back. According to Cintron's police statement, Morales told Robles that after Johnson fled, Morales pulled up in a car, got out, and shot Martinez again. Cintron recalled Johnson coming to

6

Robles's home shortly after Morales left and refusing to answer any questions about the incident. Cintron told the police that the next day she overheard Johnson telling another occupant of the house that he had shot Martinez and fled after hearing a girl shout "here come the cops." (JA 505).

Prior to trial, Johnson brought a motion to compel discovery. The state court held a hearing on the motion on May 15, 1998. At the hearing, Johnson sought "all information and reports in possession of the Reading Police Department and DANET concerning any and all criminal activities charged and uncharged, past and present of George Robles." (JA 310-11). It was Johnson's theory that "Robles was actively engaged in criminal enterprises in Reading. . . . [And] that certain police officer[s] were aware of that, that that's been for some reason, uncharged and we'd like to find out why that is and what they know about him. [Because] [t]his guy has no arrest record." (*Id*. at 309-10). In response, the District Attorney denied the existence of any such evidence, stating that he was "unaware of any reports which state[] that . . . [Robles] is a suspect of a crime." (*Id*. at 313). The court inquired of the District Attorney, "[s]o, we agree that you are stating that he has no convictions and that you have no information about any police reports which name him as a suspect?" (*Id*. at 314). "That's correct," replied the District Attorney, "I believe that there was a report turned over . . . where Mr. Robles may have been shot at . . . that's the only report I am aware of Mr. Robles being involved in any criminal activities." (*Id*.)

At the hearing, Johnson also sought discovery into whether any of the Commonwealth's witnesses were on probation or parole, or had received any agreements,

7

inducements, or promises with respect to their testimony. (*Id*. at 318-19). The District Attorney represented that "there have been no promises or inducement to any of the witnesses . . . there are no plea agreements, there are no pending cases that I am aware of and there's been no promise for the testimony." (*Id*. at 319).

The state court, relying on the representations of the District Attorney, did not order the discovery Johnson sought with respect to Robles. (*Id*. at 323).

## B. Undisclosed Evidence

In reality, the Commonwealth possessed copious evidence linking Robles to various criminal investigations in addition to information bearing on the motives of Cintron and Velazquez that it never disclosed to Johnson. It was not until nearly ten years later when the District Court granted Johnson discovery during the habeas corpus proceedings that all of the undisclosed evidence came to light. This evidence includes:

- A police investigation into a February 27, 1996 assault in which Robles, who was under suspicion for threatening two individuals with a firearm and discharging his firearm into the air, offered to provide the police with information concerning an unrelated murder investigation;

- A police investigation into an April 25, 1996 shooting in which Robles's fingerprint was found on a cigar box containing cash and 103 bags of crack cocaine that was recovered from the shooting suspect; and in which police officers returned to

8

Robles a safe recovered during the investigation containing a gun and a cell phone;

- A police investigation into an August 1, 1997 shots-fired incident in which Robles was identified at the scene, questioned by police, found to possess a handgun with similar casings as those fired, and had the weapon confiscated but returned to him at a later date;

- A police investigation of a September 18, 1997 shots-fired incident in which Robles was questioned as a suspect but never charged;

- A police investigation of a November 7, 1997 shots-fired incident in which Robles's gun was used but he was never charged;

- Police reports including statements by victims or witnesses attesting to Robles's involvement in drug-dealing;

- Robles's statement that a Reading Police officer told him that his "potpourri and marijuana did not mix too well," but he was not arrested and that certain Reading Police officers complimented him about his intelligence in the way he "ran things";

- A Reading police report dated July 7, 1998, (two days before Cintron testified at Johnson's trial), in which Cintron is listed as a suspect in an assault case that ultimately resulted in assault charges against her being dropped; and

9

- A police report documenting that Cintron lied to the police about Robles's whereabouts during an investigation into his involvement in a February 27, 1996 shooting.

Additionally, defense investigators swore to affidavits representing that Velazquez testified against Johnson only after being threatened by the investigating officers with criminal conspiracy charges and that Cintron was coerced into testifying by the investigating police officers and Robles.

Johnson did not have the benefit of this evidence in preparing for trial, and the jury never got a chance to consider this evidence in weighing the credibility of the testimony against Johnson.

## C. Evidence at Trial

At Johnson's trial,[1] the Commonwealth presented no physical evidence or eyewitness testimony connecting Johnson to the shooting of Martinez. Instead, the Commonwealth's case consisted of two eyewitnesses who were unable to make an identification of the shooter and three witnesses claiming to have heard Johnson confess to killing Martinez.

Witness Pearl Torres testified that at approximately on 11:15 p.m. on November 1, 1996, she was driving on Schuylkill Avenue in Reading when she observed two men

---

[1]Interestingly, Morales was tried separately and his trial resulted in a hung jury and a mistrial. (JA 316).

run out into the road in front of her; the second man was carrying a semiautomatic firearm and chasing the first man. According to her testimony, he fired one shot, causing the victim to fall to the ground in a fetal position, and then crossed the street and proceeded to fire three more shots into the victim before running off toward the 100 block of Elm Street. Torres was unable to identify the shooter at trial.

The Commonwealth presented the testimony of Shannon Sanders that she was walking up an alley just off Schuylkill Avenue on November 1, 1996, when she heard three shots fired. Sanders told the jury that a man ran by her moments later carrying a 9-millimeter semiautomatic handgun and said, "Yo, that mother's fucker [sic] dead. . . . I just killed him." (JA 785). She testified that she told him to run and he proceeded to run north on Elm Street. Although Sanders was an acquaintance of Johnson's, she could not identify him as the man she saw that night because she only "glance[d]" the "side of his face" for a "quick instant." (JA 783, 785).

The principal witness against Johnson at trial was George Robles. Robles testified that on the night of November 1, 1996, he was at home with several friends smoking a considerable amount of marijuana and consuming a significant amount of beer. According to Robles, Johnson, his "best friend," showed up out of breath around midnight and confessed that he had just killed someone. Johnson said that he and Morales had confronted Martinez at a convenience store on Schuylkill Avenue about a debt he owed their friend. Johnson fired at Martinez in the store but his gun jammed and Martinez took off running down the street. According to Robles's testimony, Johnson and Morales got

11

into a van and drove off in pursuit of Martinez; Johnson exited the van, ran to Martinez, and fired several shots at him. Johnson told Robles that after the shooting he encountered a girl nearby, and thinking she was Morales, told her that he had shot the victim. Robles testified that Johnson asked him to keep his gun, which Robles described as a 9-millimeter semiautomatic, but Robles refused and Johnson left with the weapon.

Robles told the jury that Morales came to his home looking for Johnson a short while later. Morales confirmed Johnson's account of the shooting to Robles, and added that after Johnson shot Martinez, he (Morales) had circled back around in the van and fired another shot into the victim "to make sure that [Johnson] did the job right." Robles identified a black Glock firearm as the type of gun that Morales possessed that night.

Given the importance of Robles's testimony, Johnson's counsel tried mightily to undercut his credibility at trial. The defense cross-examined Robles at length about his involvement in the "Nyte Life Clique" (the "NLC"), which defense counsel suggested was a gang, his alleged drug-dealing, his feud with Johnson after Johnson left the NLC, and his relationship with the Reading police. Robles denied any involvement in drug dealing or gang activity. Defense counsel insinuated that the Reading police overlooked Robles's criminal activities because he provided them with information, including fabricating testimony against Johnson. However, because Robles had no convictions or even arrests (outside of the material witness warrant), the cross-

12

examination consisted of little more than counsel's allegations and Robles's repeated denials.[2]

Luz Cintron testified at trial that both Johnson and Morales visited the home she shared with Robles on the night of the shooting. But, contradicting Robles's testimony, she stated that Morales showed up first and that Johnson came by later. According to her testimony, the next day when she returned home from work, she overheard Johnson telling another occupant of the home what he and Morales had done to Martinez. Cintron testified that Johnson said that he exited the van, confronted the victim, and then proceeded to chase and shoot him.

Mylta Velazquez testified that while she and Johnson were watching television several days after the shooting, a news report about the shooting came on. She stated that Johnson asked her if he could trust her and then admitted to being a hit man and to shooting the victim. He also told Velazquez about his brief encounter with Shannon Sanders just after committing the crime. Velazquez's trial testimony differed from her prior police statement in two respects. First, she told the jury that she had seen Johnson with a gun despite having denied that in her previous statement to the police. Second, she testified that after Johnson was arrested, Sanders confided in her that Johnson was the man Sanders had spoken

[2]Defense counsel also tried to imply during cross-examination that Robles had manufactured Johnson's confession in order to be released from jail where he had been held as a material witness. However, because Robles first came forward in December, months before going to jail as a material witness, this tactic was unconvincing.

with on the night of the shooting. On cross-examination, Velazquez admitted that this was the first time she had told anyone of this conversation. Sanders testified that she never had any such conversation with Velazquez.

In his closing argument, the District Attorney addressed the cross-examination of Robles:

> How many of us have been unemployed at times in our life [sic]? Does that mean we sell drugs? There is no doubt that Mr. Robles is not a saint, but for the defense to come in here and accuse him of being a drug dealer with no evidence other than the man is unemployed is wrong. Use your common sense. Cell phones and pagers alone don't make people drug dealers. And I submit to you that if the man was involved in criminal activity, the Reading Police would do their [sic] job.

(JA 1408-09).

The jury convicted Johnson of first-degree murder, aggravated assault, possession of an instrument of crime, possession of a firearm without a license, and related conspiracies, on July 14, 1998. Johnson was sentenced to life imprisonment without parole for his first-degree murder conviction.[3]

---

[3]Johnson also received a sentence of death for an unrelated conviction, with respect to which he is similarly seeking a writ of habeas corpus. The petition is currently stayed,

### D.     Procedural History

Like many habeas corpus petitioners, Johnson has transversed a long and circuitous path to reach this court. After an unsuccessful direct appeal of his conviction, Johnson filed a PCRA petition arguing that his trial counsel was ineffective. The Court of Common Pleas denied the petition, and the Superior Court affirmed the denial. Johnson then filed a second PCRA petition, which he later sought to supplement with the first of many *Brady* allegations.

While his second PCRA petition was under review, Johnson filed a petition for a writ of habeas corpus in the United States District Court for the Eastern District of Pennsylvania on June 25, 2004. His habeas corpus petition raised several claims, including allegations that the Commonwealth wrongfully withheld impeachment evidence related to the Commonwealth's three primary witnesses— Robles, Cintron, and Velazquez—in violation of *Brady*.

The District Court granted Johnson considerable discovery on his *Brady* claim. Following the Commonwealth's production of previously undisclosed evidence at the direction of the District Court, Johnson filed three more "protective" PCRA petitions in state court. Although Johnson filed five PCRA petitions in total, we need only concern ourselves with the last three (collectively, the "final PCRA petition").

---

pending resolution of Johnson's PCRA petition by state courts. *See Johnson v. Beard*, No. 03-2156 (E.D. Pa.).

15

The Court of Common Pleas denied Johnson's final PCRA petition. It held that Johnson's *Brady* claim was untimely under the PCRA because it was filed more than one year from the date on which his judgment of sentence became final. It further concluded that none of the statutory exceptions to the one-year limitations period applied. The Superior Court affirmed the denial of the final PCRA petition as untimely, culminating Johnson's post-conviction process in state court.

Johnson appeals from the District Court's November 2009 order denying his habeas corpus petition with respect to his *Brady* claim, *Johnson v. Folino*, 671 F. Supp. 2d 658, 674 (E.D. Pa. 2009), as well as the District Court's subsequent ruling on reconsideration. In its initial decision, the District Court began by examining the Superior Court's denial of Johnson's final PCRA petition. *Id*. at 668. The District Court held that the one-year limitations period with which Johnson failed to comply constituted an independent and adequate state-law ground for the denial of his PCRA petitions. *Id*. Concluding that Johnson had procedurally defaulted his *Brady* claim, the District Court therefore proceeded to analyze whether Johnson could overcome the procedural default and obtain federal review of his *Brady* claim by establishing either "cause and prejudice," which mirrors the second and third prongs of a *Brady* violation—suppression and materiality—or a "fundamental miscarriage of justice." *Id*. at 667-69.

The District Court held that Johnson could not establish both cause and prejudice with respect to the undisclosed evidence related to Cintron and Velazquez. It concluded that the Commonwealth had not suppressed the

16

fact that the two witnesses were coerced into testifying because that information "could have been obtained by [Johnson] through the exercise of reasonable diligence, including the opportunity to cross-examine during trial." *Id*. at 671, 673. Further, the District Court held that neither Cintron's involvement in an assault days before her testimony nor her prior inconsistent statements about Robles's whereabouts during an unrelated police investigation were material for *Brady* purposes. *Id*. at 671-72.

As to the undisclosed evidence related to Robles, the District Court held that Johnson could not establish prejudice because it concluded that evidence pertaining to Robles's uncharged criminal conduct would have been inadmissible under Pennsylvania law to impeach the veracity of a witness and therefore was not material for *Brady* purposes. *Id*. at 669. Even assuming that the evidence was admissible, the District Court still considered it immaterial because it perceived two flaws in Johnson's theory that Robles received favorable treatment from Reading police in return for assisting in the prosecution of others. *Id*. at 670. First, the District Court noted that the Berks County District Attorney's Office, not the Reading Police, makes charging decisions. *Id*. Second, the District Court observed that the evidence is subject to the equally plausible inference that insufficient evidence of Robles's criminal activities existed to initiate formal charges against him. *Id*. Therefore, the District Court concluded that the evidence "would not 'put the whole case in such a different light as to undermine confidence in the verdict.'" *Id.* (quoting *Youngblood v. West Virginia*, 547 U.S. 867, 870 (2006)).

17

In response to Johnson's motion for reconsideration, the District Court altered course with respect to its evaluation of the undisclosed evidence related to Robles, reasoning that the evidence actually would have been admissible under Pennsylvania law to impeach for bias. It also concluded that the evidence could be material notwithstanding the flaws it had previously identified. Nevertheless, the District Court reasoned that the evidence would still be inadmissible because it was "extremely speculative, tangential to the issues . . . , and was also likely to confuse the jury." (JA 5). Therefore, the District Court did not conduct an explicit cumulative prejudice analysis. It again denied Johnson's petition, but granted a certificate of appealability with respect to his *Brady* claim, acknowledging that reasonable jurists could disagree with its conclusion and find Johnson entitled to habeas relief.

Pursuant to that certificate, Johnson timely filed the instant appeal.

## II.    Jurisdiction and Standard of Review

The District Court had jurisdiction under 28 U.S.C. §§ 2241(a) and 2254(a), and we have jurisdiction under 28 U.S.C. §§ 1291 and 2253. *See Holland v. Horn*, 519 F.3d 107, 111 (3d Cir. 2008).

As the District Court did not conduct an evidentiary hearing, our review of its order denying habeas relief is plenary. *Id.* In this case, the state court did not reach the

18

merits of Johnson's final PCRA petition.[4] Therefore, "'the deferential standards provided by AEDPA . . . do not apply,'" *Taylor v. Horn*, 504 F.3d 416, 429 (3d Cir. 2007) (quoting *Appel v. Horn*, 250 F.3d 203, 210 (3d Cir. 2001)), and we "must conduct a de novo review over pure legal questions and

---

[4]The Superior Court affirmed the denial of Johnson's second PCRA petition on timeliness grounds. It concluded that the governmental-interference exception to the PCRA statute of limitations did not apply because Johnson's "underlying *Brady* claim is meritless." (JA 92). We recognize that this arguably could be considered a ruling on the merits of Johnson's *Brady* claim. Where a state court adjudicates the merits of a habeas petitioner's claim, under AEDPA, a federal court may not grant the petition "unless the adjudication of the claim (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d). However, we do not credit the court's conclusory statement as a true merits ruling, and the parties both agree that it was merely concluding that it would not recognize an exception to the timeliness bar. Accordingly, we need not consider whether the Superior Court's decision implicates *Cullen v. Pinholster*, 131 S. Ct. 1388 (2011), or affects the procedural default analysis, *see Stewart v. Smith*, 536 U.S. 856, 860 (2002) ("Even though [the Arizona state procedural rule] does not require a federal constitutional ruling on the merits, if the state court's decision rested primarily on a ruling on the merits nevertheless, its decision would not be independent of federal law.").

mixed questions of law and fact, as a court would have done prior to the enactment of AEDPA," *Appel*, 250 F.3d at 210 (citation omitted).

## III. Discussion

The Superior Court denied Johnson's final PCRA petition as untimely under state law. "Where a state court refuses to consider a [habeas] petitioner's claims because of a violation of state procedural rules, a federal . . . court is [generally] barred by the procedural default doctrine from considering the claims." *Johnson v. Pinchak*, 392 F.3d 551, 556 (3d Cir. 2004) (citing *Harris v. Reed*, 489 U.S. 255, 262 (1989)). A federal court may consider the merits of a procedurally defaulted claim only if "the petitioner establishes 'cause and prejudice' or a 'fundamental miscarriage of justice' to excuse the default." *Holloway v. Horn*, 355 F.3d 707, 715 n.3 (3d Cir. 2004) (quoting *Coleman v. Thompson*, 501 U.S. 722, 750 (1991)). It has been observed that the cause and prejudice analysis in a habeas case based on *Brady* parallels two of the three components of the underlying alleged *Brady* violation. *Banks v. Dretke*, 540 U.S. 668, 691 (2004).

In *Brady*, the Supreme Court held that "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment." 373 U.S. at 87. "Impeachment evidence, . . . as well as exculpatory evidence, falls within the *Brady* rule." *United States v. Bagley*, 473 U.S. 667, 676 (1985). In fact, the prosecution has an affirmative "duty to disclose such evidence . . . even though there has been no request [for the evidence] by the accused." *Strickler*

20

*v. Greene*, 527 U.S. 263, 280 (1999) (citing *United States v. Agurs*, 427 U.S. 97, 107 (1976)). Indeed, that responsibility "encompasses evidence 'known only to police investigators and not to the prosecutor.'" *Id.* at 280-81 (quoting *Kyles v. Whitley*, 514 U.S. 419, 438 (1995)). "In order to comply with *Brady*, therefore, 'the individual prosecutor has a duty to learn of any favorable evidence known to the others acting on the government's behalf . . . , including the police.'" *Id.* at 281 (quoting *Kyles*, 514 U.S. at 437). However, even when the prosecution has failed to disclose favorable evidence to the defense, a constitutional violation is not inevitable. A new trial will be granted only if: (1) the evidence at issue is favorable to the accused; (2) the evidence was suppressed by the state; and (3) the evidence is material. *See id.* at 281-82.

Therefore, as we noted above, "cause and prejudice," which excuse procedural default, mirror the last two elements of a *Brady* violation. This is because in the specific context of a *Brady* claim, "a petitioner shows 'cause' when the reason for his [default] in state-court proceedings was the State's suppression of the relevant evidence." *Banks*, 540 U.S. at 691. And "coincident with the third *Brady* component . . . , prejudice within the compass of the 'cause and prejudice' requirement exists when the suppressed evidence is 'material' for *Brady* purposes." *Id.*

The District Court focused primarily on the prejudice prong of the "cause and prejudice" analysis, and we will circumscribe our review of the District Court's decision accordingly.[5]

---

[5]Johnson, of course, does not confine his arguments of error to the issue of prejudice. Nevertheless, prejudice was both the

21

To demonstrate prejudice excusing the procedural default of a *Brady* claim, a habeas petitioner must show that the undisclosed evidence is material. "The evidence is material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *Bagley*, 473 U.S. at 682. "[A] showing of materiality does not require demonstration by a preponderance that disclosure of the suppressed evidence would have resulted ultimately in the defendant's acquittal . . . ." *Kyles*, 514 U.S. at 434. Rather, the "touchstone of materiality is a 'reasonable probability' of a different result." *Id*. "The question is . . . whether in [the evidence's] absence [the petitioner] received a fair trial, understood as a trial resulting in a verdict worthy of confidence. A 'reasonable probability' of a different result is accordingly shown when the government's evidentiary suppression 'undermines confidence in the outcome of the trial.'" *Id.* (quoting *Bagley*, 473 U.S. at 678).

"The materiality of *Brady* material depends almost entirely on the value of the evidence relative to the other evidence mustered by the state." *Rocha v. Thaler*, 619 F.3d 387, 396 (5th Cir. 2010) (internal quotation marks and citation omitted). Suppressed evidence that would be cumulative of other evidence or would be used to impeach

---

heart and the bulk of the District Court's analysis. Because we find multiple analytical errors within that analysis that merit reversal and remand, we need not address Johnson's other arguments toward that end. Thus, we assume without deciding, that the District Court was correct that there were adequate and independent state-law grounds for procedural default. *Harris*, 489 U.S. at 262.

testimony of a witness whose account is strongly corroborated is generally not considered material for *Brady* purposes. *Id.* at 396-97. Conversely, however, undisclosed evidence that would seriously undermine the testimony of a key witness may be considered material when it relates to an essential issue or the testimony lacks strong corroboration. *Id.* at 397.

A court must "evaluate the tendency and force of the undisclosed evidence item by item" to determine whether the evidence is material. *Kyles*, 514 U.S. at 436 n.10. In addition, a court must "evaluate its cumulative effect for purposes of materiality separately." *Id.* Individual items of suppressed evidence may not be material on their own, but may, in the aggregate, "undermine[] confidence in the outcome of the trial." *Bagley*, 473 U.S. at 678.

In this case, the District Court concluded that Johnson had failed to demonstrate prejudice with respect to the suppressed evidence concerning Robles (and to a lesser extent Cintron) because in the District Court's estimation, "the alleged *Brady* evidence would not have been admissible despite its potential probative value" as much of it was "extremely speculative, tangential to the issues . . . , and was also likely to confuse the jury." (JA 5). Therefore, the District Court concluded that an explicit cumulative prejudice analysis was unnecessary. (*Id.*).

Johnson attacks the District Court's reasoning on several bases. First, he argues that the District Court erred when it concluded that the suppressed evidence was inadmissible. Second, Johnson contends that the District Court erred because it never conducted a cumulative

23

prejudice analysis. We agree that the District Court erred in both these respects. In essence, we disagree with the significance the District Court ascribed to the issue of admissibility as well as the District Court's failure to conduct an item-by-item and cumulative evaluation of the suppressed evidence.

We begin with the proper role of admissibility in a *Brady* materiality analysis. The District Court was correct that admissibility is a consideration that bears on *Brady* materiality. The materiality standard, however, is not reducible to a simple determination of admissibility.[6] Rather, we believe, as do the majority of our sister courts of appeals, that inadmissible evidence may be material if it could have led to the discovery of admissible evidence. *Ellsworth v. Warden*, 333 F.3d 1, 5 (1st Cir. 2003) (en banc); *United States v. Gil*, 297 F.3d 93, 104 (2d Cir. 2002); *Bradley v. Nagle*, 212 F.3d 559, 567 (11th Cir. 2000); *United States v. Phillip*, 948 F.2d 241, 249 (6th Cir. 1991). *But see Hoke v.*

---

[6]The District Court relied on *United States v. Oxman*, 740 F.2d 1298, 1311 (3d Cir. 1984), for the proposition that "[i]n order to be material, evidence suppressed must have been admissible at trial." *Oxman* is of dubious precedential value in light of the Supreme Court's decision in *United States v. Pflaumer*, 473 U.S. 922 (1985), vacating and remanding the case without opinion for further consideration of *Bagley*, 473 U.S. at 667, which is relevant to the cited proposition. Moreover, in *Oxman* we concluded that the suppressed evidence was admissible and so we never had occasion to consider whether inadmissible evidence may be material under *Brady*. 740 F.2d at 1311. We are not bound by our dicta in *Oxman*.

*Netherland*, 92 F.3d 1350, 1356 n.3 (4th Cir. 1996). Furthermore, like the Court of Appeals for the Second Circuit, we think that inadmissible evidence may be material if it could have been used effectively to impeach or corral witnesses during cross-examination. *Gil*, 297 F.3d at 104. Thus, the admissibility of the evidence itself is not dispositive for *Brady* purposes. Rather, the inquiry is whether the undisclosed evidence is admissible itself *or* could have led to the discovery of admissible evidence that could have made a difference in the outcome of the trial sufficient to establish a "reasonable probability" of a different result.

Johnson pressed this point at oral argument before us, urging that cross-examination might have proceeded differently and more effectively if he had been armed with the wealth of undisclosed impeachment evidence. For example, Johnson could have cross-examined Robles about specific instances in which he was approached by the police as a person of interest in several felonies. If, in the face of these pointed questions, Robles still maintained that he was a law-abiding citizen without any motivation to manufacture testimony against Johnson, Johnson suggests that he could have called police officers to testify that Robles was aware that he was under investigation and that during the course of one such investigation Robles had offered to supply information regarding an unrelated murder. Furthermore, Johnson urges that the District Attorney would not have been able to discount Johnson's attack on Robles's credibility in his closing argument had Johnson had access to all of the impeachment evidence in the possession of the Commonwealth.

25

Even if we were to accept the proposition that suppressed evidence must be admissible in order to be material under *Brady*—which we do not—we could not endorse the District Court's application of such a principle here. To begin, the District Court never "evaluate[d] the tendency and force of the undisclosed evidence item by item."[7] *Kyles*, 514 U.S. at 436 n.10. In reaching the

---

[7]Although materiality lies at the heart of our decision to vacate the judgment of the District Court, we would be remiss if we did not address the District Court's cause analysis. While the District Court did not address the suppression issue with respect to most of the undisclosed evidence, it did hold that Johnson had not established cause as to the evidence that Cintron and Velazquez were coerced into testifying. *Johnson*, 671 F. Supp. 2d at 671-73. The District Court reasoned that the Commonwealth was not required to disclose any coercion by the Reading police because that information could have been obtained by Johnson through the exercise of reasonable diligence, including the opportunity to cross-examine during trial. *Id*. at 671, 673.

The rule applied by the District Court overstates what sort of evidence is available to a reasonably diligent defendant. As Johnson argues, it simply cannot be the case that any information possessed by a witness—particularly a government witness—is available as long as he or she is subject to cross-examination. The Seventh Circuit Court of Appeals has also rejected "as untenable a broad rule that any information possessed by a defense witness must be considered available to the defense for *Brady* purposes." *Boss v. Pierce*, 263 F.3d 734, 740 (7th Cir. 2001). We agree that reasonable diligence does not require defense counsel to "ask witnesses about matters of which counsel could not have

26

conclusion that Johnson had failed to establish prejudice, the District Court reasoned that "much of the evidence" was speculative, tangential, likely to confuse, and therefore inadmissible. (JA 5). Such a broad and conclusory ruling fails to address the varied nature of the undisclosed evidence in this case. On remand, the District Court must evaluate the materiality of each item of suppressed evidence individually, bearing in mind not only its content, but also where it might have led the defense in its efforts to undermine Robles. This approach may seem laborious, but as the Supreme Court has observed, "there is no other way." *Kyles*, 514 U.S. at 436 n.10.

Moreover, the District Court must consider the cumulative effect of all of the evidence that was suppressed and favorable to Johnson. Even items of evidence that the District Court may not consider material on their own must still be considered as part of a cumulative materiality analysis.[8] *Simmons v. Beard*, 590 F.3d 223, 237 (3d Cir.

---

reasonably expected a witness to have knowledge." *Id.* at 743. On remand, the District Court should reconsider its ruling in light of this more narrow principle. Additionally, the District Court might examine what impact the District Attorney's representation that "there ha[d] been no promises or inducement to any of the witnesses . . . there [were] no plea agreements, there [were] no pending cases . . . and there's been no promise for the testimony [of any witness]" has on the cause analysis, if any. (JA 319).

[8]The District Court discounted a police report documenting Cintron's lie to the police regarding Robles's whereabouts during the investigation of a February 27, 1996 shooting

2009); *Smith v. Sec'y, Dep't of Corr.*, 572 F.3d 1327, 1346 (11th Cir. 2009). "Cumulative analysis of the force and effect of the undisclosed pieces of favorable evidence matters because the sum of the parts almost invariably will be greater than any individual part." *Smith*, 572 F.3d at 1347.

Finally, we are troubled by the District Court's unsupported conclusion that the suppressed evidence would have been inadmissible. As Johnson points out, and the District Court clearly acknowledged, Pennsylvania Supreme Court precedent appears to suggest that some, if not all, of the undisclosed evidence would have been material impeachment evidence.[9] However, while citing this precedent and noting

---

incident because it alone was not sufficient to establish a "reasonable probability" of a different outcome. *Johnson*, 671 F. Supp. 2d at 672. On remand, the District Court must still consider this item when evaluating the cumulative tendency and strength of all the suppressed, favorable evidence.

[9]The District Court cited *Commonwealth v. Williams*, 570 A.2d 75, 80 (Pa. 1990), for the proposition that "a party against whom a witness is called always has the right to show by cross-examination that a witness is biased." (JA 4). It also quoted language from *Commonwealth v. Collins*, 545 A.2d 882, 885 (Pa. 1988), that "[Pennsylvania] law clearly establishes that any witness may be impeached by showing his bias or hostility, or by proving facts which would make such feelings probable." (JA 4). The District Court did not refer to *Commonwealth v. Evans*, 512 A.2d 626 (Pa. 1986), which arguably provides even stronger support for Johnson's position. In *Evans*, the Pennsylvania Supreme Court held that the state's constitution guarantees the right of a criminal

28

the "opportunity" and "right" to impeach for bias that is guaranteed to a defendant, it seems not to have considered and did not discuss the importance and critical nature of this type of evidence. Instead, the District Court characterized the evidence as tangential, speculative, and confusing. Neither the District Court nor the Commonwealth cite any legal authority supporting its inadmissibility as a matter of state law. The role of the District Court was to follow relevant Pennsylvania law at the time of Johnson's trial.[10] To be clear, we do not hold that the undisclosed evidence is admissible as a matter of state law. Indeed, the District Court as a trial court is in a much better position to make admissibility determinations than we are as a reviewing court. Nevertheless, whatever the District Court's ruling as to

---

defendant to cross-examine a witness about "outstanding criminal charges or . . . non-final criminal disposition[s] against him within the same jurisdiction," because of the potential for bias, "[e]ven if the prosecutor has made no promises, either on the present case or on other pending criminal matters, [since] the witness may hope for favorable treatment from the prosecutor if the witness presently testifies in a way that is helpful to the prosecution." *Id*. at 631. This right "is not to be denied or abridged because incidentally facts may be developed that are irrelevant to the issue and prejudicial to the other party." *Id*. at 632 (internal quotations marks omitted).

[10]We are also puzzled by the Commonwealth's reliance on the Pennsylvania Rules of Evidence to support its argument that the evidence was inadmissible because the Rules were not effective until October 1, 1998, after Johnson's trial.

admissibility of the undisclosed evidence is on remand, it must find some basis in state law.[11]

## IV.    Conclusion

Johnson argues that because the District Court's "prejudice" analysis is subject to de novo review, we should act to correct the District Court's errors by granting the writ of habeas corpus ourselves. However, we believe that it is the District Court that should evaluate Johnson's claim anew in light of our opinion today. With no physical or eyewitness evidence connecting Johnson to the shooting, we think the potential impact of the undisclosed impeachment evidence deserves a hard look, bearing in mind that ultimately, "[t]he

---

[11]We note that the admissibility issues in this case are far less clear than those presented in *Brady*, 373 U.S. at 90 and *Wood v. Bartholomew*, 516 U.S. 1, 5-8 (1995) (holding that the failure of the prosecution to disclose that a witness had taken a polygraph test was not material under *Brady* where the parties agreed that the results of the test were inadmissible under state law). In *Brady*, the Supreme Court concluded that the state court had in fact already ruled on the issue of admissibility and so considered that ruling despite its reticence to delve into questions of state law. 373 U.S. at 90. In *Wood*, the undisclosed polygraph results would not have led to admissible evidence, but instead, could only have been relevant to contradict witness testimony and both parties agreed that the results were not admissible for any purpose, including impeachment. 516 U.S. at 6. This case is a far cry from *Wood* and *Brady*—there has been no state court ruling as to the admissibility of the suppressed evidence nor do the parties agree on the issue.

question is . . . whether in [the evidence's] absence [the petitioner] received a fair trial, understood as a trial resulting in a verdict worthy of confidence." *Kyles*, 514 U.S. at 434. We will remand so that the District Court can consider all paths to materiality discussed above, in addition to any others that Johnson can identify. We are a reviewing court and the resolution of the issues discussed herein will benefit from two-tiered review. *Smith*, 572 F.3d at 1348-49.

We reiterate that this is not the usual § 2254 habeas corpus case in which we confine our review to the state court record before us. The substantial impeachment evidence of the Commonwealth's star witness was only uncovered during the discovery process in federal court. Therefore, we have no reason to review the rulings made by the state court nor consider their propriety. Instead, our role as a federal court is limited to weighing the impact the undisclosed evidence could have had at Johnson's trial against the case presented by the Commonwealth and the defense mounted by Johnson to determine "whether in [the evidence's] absence [Johnson] received a fair trial." *Kyles*, 514 U.S. at 434.

In light of this newly disclosed evidence, and the relative paucity of other evidence connecting Johnson to the murder of Martinez, could confidence in the verdict be undermined? That question is more properly addressed by the District Court in the first instance.

For the foregoing reasons, we will reverse the judgment of the District Court and remand for further proceedings consistent herewith.