EDUARDO C. ROBRENO, J.
On January 24, 2019, a grand jury returned a four-count superseding indictment, charging Defendant Kashamba John with one count of conspiracy to engage in sex trafficking of children or sex trafficking by force, threats of force, fraud, or coercion, one count of sex trafficking by force, threats of force, fraud, or coercion, and two counts of transporting an individual *460 in interstate commerce with the intent that such individual engage in prostitution.
During Defendant's trial, the Government belatedly disclosed a missing-persons report regarding one of the alleged victims. Defendant moved for a mistrial. Following a hearing, the Court denied the motion and fashioned another remedy for the belated disclosure of the report. This opinion supplements the Court's bench ruling on May 29, 2019, denying the motion for a mistrial, which was memorialized in an order on May 30, 2019. ECF No. 132.
I. BACKGROUND
A. The First Week of Trial: The Testimony of Erica Jara
On May 20, 2019, the Court heard opening statements, and the Government began its case. Over the course of the trial, the jury heard the testimony of five victims, two of whom were minors during the relevant time. At issue here is the testimony of one of the minors, Ms. Erica Jara.
On May 23, 2019, Ms. Jara testified for the Government. Ms. Jara testified that between December 2012 and January 2013, when she was fifteen years old, she ran away from home. Tr. of Erica Jara's Test. at 4, ECF No. 133. She testified that she met Defendant during the relevant time through an online dating website. Id. at 5-6. She further testified that after she told Defendant that she did not have any money, he told her that "he could help [her] get some money" if she had sex with other people. Id. at 7. Ms. Jara then testified that she went to a hotel in Tampa, Florida, with Defendant where she performed commercial sex acts. Id. at 8. According to her testimony, when she got to the hotel, Defendant provided her with a phone and threw her personal phone out of the hotel room's window. Id. at 11.
Ms. Jara testified that Defendant then took her to a hotel in Atlanta, Georgia, and during the ride to Atlanta, she told Defendant that she was fifteen years old. Id. at 19. She also testified that Defendant burned her with a cigarette when she told Defendant that she did not want to perform a certain sexual act and later burned her with a lighter when she did not take a client's call and told Defendant that she wanted to go home. Id. at 21-23. Ms. Jara testified that after the second time she was burned, she "took a ride" with Defendant and a man named Jay. Id. at 21-22. Ms. Jara testified that during that ride Defendant and Jay pushed her out of the car on the side of a highway in Atlanta. Id. at 21-22.
Defense counsel then cross-examined Ms. Jara. On cross, Ms. Jara was asked about where she stayed after she ran away from home, how long she was away from home, and her use of marijuana during the relevant time. Id. at 30-32. Ms. Jara testified that she was with Defendant for approximately two weeks and that when she was picked up by police, she was afraid of her mother, who had told Ms. Jara that she would send her to social services if she ran away again. Id. at 33, 41. Ms. Jara was also asked about inconsistencies regarding the amount of time she had been with Defendant (such as whether she had told a special agent that she had been with Defendant for "a couple of days") and what she told police about the burns when she was first picked up by the police. Id. at 42-45. Defense counsel also asked Ms. Jara about various Facebook messages that she allegedly sent to her family stating that she was not coming home. Id. at 46-47.
Cross-examination also focused on whether Defendant knew Ms. Jara was a minor given that the website she met Defendant through required that the user be at least eighteen. Id. at 40-41, 47-48.
*461 The Government then re-directed Ms. Jara. Id. at 51-53. There was no re-cross of Ms. Jara.
B. The Disclosure of the Missing-Persons Report
During the Government's case-in-chief, on May 28, 2019, the Government informed the Court that it had belatedly disclosed a missing-persons report regarding Ms. Jara. The belated disclosure occurred over the Memorial Day weekend after Ms. Jara had already testified on May 23, 2019. The report was prepared by James Iverson, a civilian missing-persons investigator for the Hillsborough County Sheriff's Department. The Government stated that the "report [had] not [been] included [with the other discovery provided before trial] in error." Tr. of Hr'g on May 28, 2019, at 19-20, ECF No. 160. The Government further explained that it was not until the Memorial Day weekend (after five days of trial) that it received the underlying documents that formed the basis of the report. The underlying documents were then immediately provided to defense counsel along with the original report.
C. The Contents of the Report
The report included statements from three witnesses who either placed Ms. Jara in Tampa, Florida, around the time she testified that she was with Defendant in Atlanta, Georgia, or refuted Ms. Jara's testimony that she did not have access to her personal phone during that time. Specifically, a friend stated that she received a text message from Ms. Jara; the Vice-Principal of Ms. Jara's school stated that she saw Ms. Jara at the mall; and a man stated that he took Ms. Jara to a party.
The report was supported by underlying documents, including phone records and Facebook records. The phone records suggested that Ms. Jara's phone was used during the relevant time and after Defendant was supposed to have thrown Ms. Jara's phone out of the hotel room's window.
D. Defendant's Motion for a Mistrial or to Strike Testimony
Defendant argued that had the missing-persons report been disclosed before trial, he would have used it both to impeach Ms. Jara's credibility and to pursue a different theory regarding the allegations involving Ms. Jara. Specifically, Defendant argued that he would have pursued a theory that he and Ms. Jara never knew each other instead of the theory presented on cross-examination that he simply did not know that she was a minor.
Defendant argued that Ms. Jara was the most damaging witness at trial. He further argued that he would have interviewed the individuals mentioned in the report to see what other evidence it might have revealed, at least as to the allegations involving Ms. Jara.
Based upon the importance of impeaching Ms. Jara with the report and the potential need for further investigation, Defendant argued a mistrial was required because of a Brady violation. In the alternative, Defendant argued that the testimony of Ms. Jara should be stricken and that she should be excised from the superseding indictment due to a violation of Federal Rule of Criminal Procedure 16.
E. The Court's Order and the Testimony of Mr. Iverson
Ruling from the bench after a hearing on this matter, the Court denied Defendant's motion and ordered remedies for the belated disclosure of the report to ensure that Defendant received sufficient due process and a fair trial. ECF No. 132. Specifically, the Court ordered that Ms. Jara be produced for additional cross-examination. The Court also gave an instruction *462 to the jury that the Government's belated disclosure of the report caused the delay in the proceedings and that Defendant was entitled to restart his cross-examination of Ms. Jara. The Court further ordered that the report be admitted into evidence except for one statement (not relevant here); that Mr. Iverson be produced to give testimony; and that the underlying Facebook and phone records be admitted into evidence. Finally, the Court ordered that Defendant could reassert his motion for a mistrial after the conclusion of any additional testimony by Ms. Jara.
Following the Court's ruling, the Court gave the above-mentioned instruction to the jury and admitted the report and underlying Facebook and phone records into evidence.
Defendant called Mr. Iverson to the stand and questioned him about the report as if on cross. Defendant chose not to recall Ms. Jara for further cross-examination or reassert his motion for a mistrial based on the belated disclosure.
F. The Verdict
On May 31, 2019, the jury convicted Defendant, but it did not find that Defendant engaged in a conspiracy to sex traffic minors, as indicated on the special verdict form. Rather, the jury convicted Defendant of conspiracy to commit sex trafficking by force, threats of force, fraud, or coercion.
II. DISCUSSION
Below, the Court first analyzes whether the missing-persons report constitutes Brady material. Next, the Court turns to issues concerning the timing of the disclosure of Brady material.
A. Does the Missing-Persons Report Constitute Brady Material?
Under Brady v. Maryland, the prosecution must produce to the defendant evidence that is material to either guilt or punishment, irrespective of good or bad faith. 373 U.S. 83, 87, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963) ; see also United States v. Bagley, 473 U.S. 667, 676, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985) (extending Brady to impeachment and exculpatory evidence); Giglio v. United States, 405 U.S. 150, 154, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972). "A Brady violation occurs if: (1) the evidence at issue is favorable to the accused, because either exculpatory or impeaching; (2) the prosecution withheld it; and (3) the defendant was prejudiced because the evidence was 'material.' " Breakiron v. Horn, 642 F.3d 126, 133 (3d Cir. 2011).
"Evidence is material if there is a reasonable probability that, if the evidence had been disclosed, the result of the proceeding would have been different." Wilson v. Beard, 589 F.3d 651, 665 (3d Cir. 2009). "A 'reasonable probability' of a different result is shown when the government's suppression of evidence 'undermines confidence in the outcome of the trial.' " Id. (quoting Kyles v. Whitley, 514 U.S. 419, 434, 115 S.Ct. 1555, 131 L.Ed.2d 490 (1995) ). The Third Circuit has further explained that "evidence may be material if it could have been used effectively to impeach or corral witnesses during cross-examination." Johnson v. Folino, 705 F.3d 117, 129-30 (3d Cir. 2013). To that end, the Third Circuit has instructed district courts to consider not only the content of the evidence at issue but also "where it might have led the defense in its efforts to undermine [a particular witness]" when determining whether evidence is "material." Id. at 131.
In this case, the report was favorable, withheld, and material. First, the report was favorable because of the impeachment *463 evidence it contained.[1] Second, the report was withheld because the Government did not disclose the report until several days after trial began. Although the Government did not receive the underlying documents until May 27, 2019, the report, which was not provided until after the first week of trial, was in its possession earlier.[2] Third, the report was material because it could be "used effectively to impeach" Ms. Jara on cross-examination. See id. at 129-30.
B. When Should the Brady Material Have Been Disclosed to Preclude a Brady Violation?
Once a court has determined that the evidence is Brady material, the next inquiry in assessing whether there is a Brady violation is "whether suppression of that evidence undermines confidence in the outcome of a criminal trial, i.e., whether the evidentiary suppression constitutes a Brady violation." Smith v. Holtz, 210 F.3d 186, 196 (3d Cir. 2000) ; see also Strickler v. Greene, 527 U.S. 263, 281-82, 119 S.Ct. 1936, 144 L.Ed.2d 286 (1999) (explaining that nondisclosure of Brady material only evolves into a Brady violation where the nondisclosure is "so serious that there is a reasonable probability that the suppressed evidence would have produced a different verdict").
In this case, to the extent that the report and underlying documents are Brady material, this Court was in the uncommon position of being able to address and prevent a potential Brady violation during trial. The Third Circuit has explained that "[t]o constitute a Brady violation, the nondisclosure must do more than impede the defendant's ability to prepare for trial; it must adversely affect the court's ability to reach a just conclusion, to the prejudice of the defendant." United States v. Starusko, 729 F.2d 256, 262 (3d Cir. 1984).
In this case, the Court must determine whether the belated disclosure of the report and underlying documents does "more than impede the defendant's ability to prepare for trial," i.e., whether Defendant could have a fair trial, despite the belated disclosure. Id. In making this determination, the Court first discusses when the report and underlying documents should have been disclosed based on Defendant's purported use of them.
1. Case Law Regarding the Timing of the Disclosure of Brady Material
As a general matter, Brady material must be disclosed in time for its effective use by the defendant at trial. See United States v. Higgs, 713 F.2d 39, 43-44 (3d Cir. 1983). To that end, the Third Circuit has explained that "[w]here the government makes Brady evidence available during the course of a trial in such a way that a defendant is able to effectively use it, due process is not violated and Brady is not contravened."
*464 United States v. Johnson, 816 F.2d 918, 924 (3d Cir. 1987).
In Higgs, the Third Circuit addressed when Brady material used for impeachment purposes must be provided to the defendant. There, the district court ordered the Government to provide the defendant with information before trial about any witnesses who had received immunity or leniency in exchange for their cooperation with the Government. Id. at 40. The Government objected, citing threats to the witnesses' lives. Id. In determining when this material had to be disclosed, the Third Circuit focused its inquiry on "what information ha[d] been requested and how it [would] be used by [the defendant]." Id. at 43-44. The Third Circuit held that there is "[n]o denial of due process ... if Brady material is disclosed to [the defendant] in time for its effective use at trial." Id. at 44. For impeachment purposes, the Third Circuit held that a defendant's "right to a fair trial will be fully protected if disclosure is made the day that the witness testifies." Id.
More recently, the Third Circuit found that there was no Brady violation where the jury had heard additional cross-examination in light of belatedly disclosed evidence. United States v. Claxton, 766 F.3d 280, 304 (3d Cir. 2014). There, the Government did not disclose certain letters that allegedly constituted Brady material to the defendant until trial. Id. at 303-04. In that case, the district court had allowed additional cross-examination of the relevant witnesses and provided defense counsel with additional time to prepare for additional cross-examination. Id. at 304. Under those circumstances, the Third Circuit concluded that due process had not been contravened.
Other courts outside of the Third Circuit have also considered when Brady material must be disclosed. The Eighth Circuit considered a situation somewhat similar to Defendant's case. In that case, during the trial, the defendant was belatedly provided with police reports, which the Eighth Circuit assumed without deciding constituted Brady material. United States v. Jeanpierre, 636 F.3d 416, 422 (8th Cir. 2011). To safeguard the defendant's due process rights in that case, the Eighth Circuit allowed the defendant to call additional witnesses based on the reports, though the defendant ultimately chose not to do so. Id. In reaching its decision, the Eighth Circuit held that because " Brady does not require pretrial disclosure, due process is satisfied if the information is furnished before it is too late for the defendant to use it at trial." Id. (internal quotation marks and citations omitted).
As the above-mentioned cases explain, the belated disclosure of Brady material does not prejudice a defendant as long as the material is provided in time for a defendant to use it effectively at trial.
2. Application to Defendant's Case
a. Defendant's arguments regarding his use of the report and how the belated disclosure prejudiced him
In this case, Defendant argues that the belated disclosure of the alleged Brady material denied him a fair trial because the belated disclosure prevented him from effectively cross-examining Ms. Jara and from conducting an adequate investigation of the allegations involving Ms. Jara.
Defendant also argues that the report reveals potentially three new witnesses (the friend who received a text from Ms. Jara, the Vice-Principal, and the man who took Ms. Jara to a party). See supra I.C. As such, because "new witnesses ... tend to throw existing strategies ... into disarray" and because the report and underlying documents contain information *465 "potentially useful in general pretrial investigation," Defendant argues that this information should have been "disclosed in time for Defendant[ ] to use it during the investigatory stages of the case." United States v. Alvin, 30 F. Supp. 3d. 323, 336 (E.D. Pa. 2014) (quoting Leka v. Portuondo, 257 F.3d 89, 101 (2d Cir. 2001) ).
When pressed about Defendant's intended use of the report and underlying documents, counsel explained that the "strategy now would be, undoubtedly, that ... [Ms. Jara] is absolutely not telling the truth about being with [Defendant]." Tr. of Hr'g on May 29, 2019, at 106, ECF No. 161. Plainly put, Defendant's primary purpose for the use of the report and the underlying documents is impeachment. To that end, Higgs requires that the material be provided the day the witness testifies so that a defendant can effectively "challenge the veracity of the government's witnesses." Higgs, 713 F.2d at 44.
b. The Court's Remedy
Under Higgs, "[a]ny possible prejudice to [Defendant] resulting from the disclosure [of the report] at trial can be easily cured by the district court." Id. In other words, as long as the Court's remedy ensures that Defendant could use the report and underlying documents effectively at trial for his stated impeachment purposes, Defendant's due process rights have not been contravened.
In this case, the Court provided a seven-part remedy to ensure that Defendant's due process rights were not contravened. ECF No. 132. First, as discussed earlier, the Court allowed Defendant to recall Ms. Jara, who was physically available at the courthouse and willing to take the stand once again. Second, the Court instructed the jury that "the delay [in resuming trial] was caused by the Government's belated production of Mr. Iverson's report," and because of the Government's belated production of the report, "the defendant will be entitled to restart the cross-examination of Erica Jara." Tr. of Trial, Day 9, at 137, ECF No. 161. The Court then reiterated that "to the extent that there has been a delay, it ha[s] been caused by the Government's belated production of [the] report." Id. Third, the missing-persons report was admitted into evidence. ECF No. 132. Fourth, Mr. Iverson was produced for testimony. Id. Fifth, the underlying Facebook records that Mr. Iverson received in connection with the report were admitted into evidence. Id. Sixth, the underlying phone records that Mr. Iverson received in connection with the report were admitted into evidence. Id. Seventh, upon the conclusion of Ms. Jara's testimony, Defendant was allowed to reassert his motion for a mistrial. Id.
By admitting the missing-persons report into evidence, the statements that were contained in the report and made by the three individuals who could have impeached Ms. Jara's testimony were also admitted. As a result, the jury learned that (1) the Vice-Principal saw Ms. Jara at the mall in Tampa when Ms. Jara claimed she was in Atlanta; (2) a man took Ms. Jara to a party in Tampa when she was supposed to have been in Atlanta with Defendant; and (3) a friend received a text message from Ms. Jara when she claimed she did not have access to her phone.
Defendant engaged in a comprehensive and exhaustive direct examination of Mr. Iverson. During the direct examination of Mr. Iverson, the jury heard his testimony that one of Ms. Jara's peers had provided information that Ms. Jara was headed towards New York about the time she claimed she was with Defendant in Atlanta. Mr. Iverson also testified about speaking with a number of people who had some contact with Ms. Jara from the time she *466 ran away to the time she was recovered. To that end, the direct examination indicated that there was never a two-week period in January 2013 (approximately the time in which Ms. Jara testified that she was with Defendant) where she had no contact with anyone either through phone, Facebook, or in-person. Mr. Iverson also testified that except for one individual, no one ever told him that Ms. Jara might be with another person during the time that Ms. Jara was away from home.[3] Tr. of Trial, Day 9, at 170. According to Mr. Iverson, that one individual suggested that Ms. Jara might be with her friend Coco, who is a woman. Id.
Defendant chose not to recall Ms. Jara.
Through the comprehensive direct examination of Mr. Iverson and the admission of the report and underlying documents into evidence, Defendant was put in a position in which he was able to impeach Ms. Jara's testimony with the belatedly disclosed missing-persons report. Although the missing-persons report was not provided to Defendant the day that Ms. Jara first appeared for cross-examination, Defendant had the missing-persons report available for further cross-examination of Ms. Jara if he had chosen to call her back to the witness stand. Further, Defendant was able to use the report to engage in a comprehensive and exhaustive examination of Mr. Iverson. To that end, the Court's remedy effectively complied with the requirement that the impeachment material be provided the day the witness testifies, and Defendant's due process rights were protected.
In light of Third Circuit case law, a mistrial was not necessary or appropriate. Defendant was not ultimately prejudiced by the belated disclosure of the report and underlying documents because the jury heard the additional testimony of Mr. Iverson and learned of the contents of the report. This evidence was considered by the jury such that due process was not contravened. See Claxton, 766 F.3d at 304 ; Johnson, 816 F.2d at 924 ; Higgs, 713 F.2d at 43-44. Indeed, the jury did not convict Defendant of a conspiracy to sex traffic minors.
III. CONCLUSION
For the foregoing reasons, the Court properly denied Defendant's motion for a mistrial during the trial.
An appropriate order issued on May 30, 2019. ECF No. 132.

Defendant has also argued that the report could have led to exculpatory evidence, at least as to the allegations involving Ms. Jara. But all of Defendant's stated purposes for the report effectively reassert impeachment purposes. See Trial Tr. Day 9 at 104-07, ECF No. 161 (discussing that based upon the missing-person report, defense counsel's strategy would be that Ms. Jara "is absolutely not telling the truth about being with [Defendant]").

There is also an argument that evidence has not been withheld when it has been disclosed during trial. See United States v. Claxton, 766 F.3d 280, 304 (3d Cir. 2014). This argument is essentially a reframing of whether the belated disclosure of Brady material denies a defendant due process and a fair trial. Therefore, the Court addresses this argument in more detail as part of the discussion of when the report should have been disclosed and whether the belated disclosure denied Defendant due process and a fair trial.

Mr. Iverson testified that "nobody said that she was with anybody [e]xcept the one gentleman said that she might have been with Coco" when asked if any of the people "who had hounded Erica between the time she ran away from home and the time that she was recovered ... said that she was with another person." Tr. of Trial, Day 9, at 170.