PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 13-9003
_____

JAMES A. DENNIS

v.

SECRETARY, PENNSYLVANIA DEPARTMENT OF
CORRECTIONS;
SUPERINTENDENT, STATE CORRECTIONAL
INSTITUTION AT GREENE;
SUPERINTENDENT, STATE CORRECTIONAL
INSTITUTION AT ROCKVIEW;
DISTRICT ATTORNEY OF PHILADELPHIA COUNTY,

Appellants
_____

On Appeal from United States District Court
for the Eastern District of Pennsylvania
(E.D. Pa. No. 2-11-cv-01660)
District Judge:  Honorable Anita B. Brody

———

Argued November 5, 2014

Before: SMITH, FISHER and CHAGARES, *Circuit Judges*.


(Filed: February 9, 2015)

Thomas W. Dolgenos, Esq. **(ARGUED)**
Ryan Dunlavey, Esq.
Philadelphia County Office of District Attorney
3 South Penn Square
Philadelphia, PA 19107
        *Counsel for Appellant*


James W. Cooper, Esq.
Rebecca L.D. Gordon, Esq.
Ryan D. Guilds, Esq.
Meghan Martin, Esq.
Amy L. Rohe, Esq.
Arnold & Porter
555 Twelfth Street, N.W.
Washington, DC 20004
        *Counsel for Appellee*


Melanie Gavisk, Esq.
Office of the Federal Public Defender
411 East Bonnevile Road
Suite 250

Las Vegas, NV 89101

    *Counsel for Appellee*

Stuart B. Lev, Esq. **(ARGUED)**
Federal Community Defender Office for the Eastern District
of Pennsylvania
Capital Habeas Unit
601 Walnut Street
The Curtis Center, Suite 545 West
Philadelphia, PA 19106

    *Counsel for Appellee*

———

OPINION OF THE COURT

———

FISHER, *Circuit Judge*.

In 1991, Chedell Williams was shot and killed in Philadelphia. James Dennis was convicted of her murder and was sentenced to death. In a series of decisions over thirteen years, the Pennsylvania Supreme Court affirmed Dennis's conviction and sentence and denied his application for post-conviction relief. Dennis filed an application under 28 U.S.C.

3

§ 2254 in the United States District Court for the Eastern District of Pennsylvania in which he claimed that a variety of federal constitutional violations justified a writ of habeas corpus. The District Court held that the Pennsylvania Supreme Court unreasonably applied *Brady v. Maryland*, 373 U.S. 83 (1963), and its progeny in rejecting Dennis's claims that the prosecution had withheld three pieces of exculpatory and material information. Concluding that the prosecution had in fact breached its obligations under *Brady*, the District Court granted a conditional writ of habeas corpus and directed the Commonwealth to retry Dennis or release him. For the reasons that follow, we will vacate the District Court's order and remand the case for consideration of Dennis's remaining claims.

I.

A.

On October 22, 1991, at around 1:50 p.m., Chedell Williams and her friend, Zahra Howard, began to climb the stairs to the Fern Rock SEPTA Station in Philadelphia. Two men approached them and demanded their earrings. Both girls fled, but one of the men caught Williams. He pulled her earrings off and shot her in the neck with a silver handgun. The shooter then ran by a construction worker, Thomas Bertha, who stepped towards the shooter. When the shooter raised his gun in Bertha's direction, Bertha briefly stopped but followed the shooter after he ran past Bertha. Bertha was three or four feet from the shooter when the shooter passed him. The two assailants entered a waiting car and drove off. Williams died of her injuries.

Howard and other bystanders described the shooter as an African-American male; between 5'7" and 5'10"; between 130 and 160 pounds; between 15 and 20 years old; and

4

wearing a red sweat suit, a black jacket, a baseball cap, and white sneakers. After the police heard rumors that James Dennis had committed the murder, officers showed Howard and other bystanders a photo line-up including Dennis's picture. Howard identified Dennis, saying, "This one looks like the guy, but I can't be sure." (J.A. 1509.) A SEPTA employee, James Cameron, also identified Dennis and said that he looked similar to the shooter, especially from the side, but that he could not be sure. Two construction workers, Bertha and Anthony Overstreet, also agreed that Dennis looked like the shooter. But four witnesses did not identify Dennis from the array. Dennis was 21 years old, African-American, 5'5", and between 125 and 132 pounds.

In early November 1991, the police interviewed a member of Dennis's singing group, Charles Thompson, who said that he saw Dennis with a silver handgun at their practice the night of Williams's murder.

On November 22, 1991, the police arrested Dennis. He signed a statement in which he said that on the day of the murder, he had stayed at his father's house until about 1:30 p.m., when his father drove him to the bus stop. He said that he then rode the bus for 30 minutes to the intersection of Henry and Midvale Avenues, that he saw a woman he knew named Latanya Cason, and that "[w]hen we got off the bus I waved to her." (J.A. 1676.) He said he then walked about a half of a mile to Abbottsford Homes, a public housing complex, and spent the rest of the day with his friends there. Dennis's father also said that Dennis had spent the morning at his father's house and that his father had driven Dennis to the bus stop at 1:53 p.m. The police searched Dennis's father's house; the lead detective signed a report stating that officers discovered two black jackets, a pair of red pants, and a pair of

5

white sneakers. However, the police lost these items before trial.

On December 19, 1991, the police conducted an in-person line-up involving Dennis and five other individuals Dennis selected. Howard, Cameron, Bertha, and Overstreet participated. Howard identified Dennis, saying, "I think it was [him]." (J.A. 229.) Cameron and Bertha identified Dennis without reservation. But Overstreet identified a different member of the line-up.

In January 1992, officers interviewed Latanya Cason, the woman Dennis said he saw the day of the murder when getting off the bus between 2:00 and 2:30 p.m. Cason said that she had seen Dennis that day, but at a different time. She said that she got off work at 2:00 p.m., collected her public-assistance funds, and ran a few errands before taking the bus to the Henry and Midvale Avenues intersection. Therefore, she estimated that she saw Dennis that day between 4:00 and 4:30 p.m.

Not all of the information the police received indicated that Dennis was the perpetrator. On October 24, 2011, officers interviewed Chedell Williams's aunt, Diane Pugh. The officers' report states that Pugh told them that Zahra Howard—Williams's friend and an eyewitness—recognized the suspects from the high school she and Williams attended. Dennis did not attend the same school as Howard and Williams. The report indicates that the officers intended to follow up with Howard about this comment, but they never did.

Additionally, on October 31, 1991, an inmate at the Montgomery County Correctional Facility, William Frazier, called the Montgomery County Detective Bureau and told them he had information about Williams's murder. The

6

Montgomery County Detective Bureau passed the tip on to the Philadelphia police, who then interviewed Frazier. Frazier told them that his aunt had initiated a three-way call with his friend, Tony Brown. Frazier said that Brown admitted to killing Williams and that the gun went off accidentally. Frazier also said that Brown implicated two men—Ricky Walker, Frazier's cousin, and Skeet—and that they were hiding out in Frazier's previous apartment. Frazier told the officers that Brown had a history of committing armed robberies. Frazier then went on a ride-along with the officers and identified a pawn shop where he believed Brown, Walker, and Skeet would have sold the earrings; Brown's home; Brown's girlfriend's home; Walker's home; and Skeet's home.

The police then interviewed Walker. Walker said he knew Williams from high school, but he denied having anything to do with Williams's murder and denied knowing Brown or Skeet. He said that his mother could verify that he was sleeping when Williams was murdered and that Frazier had previously burglarized Walker's home and charged $1,000 in calls to Walker's family. The officers also interviewed the owner of Frazier's previous apartment, who said that no one had entered the apartment to his knowledge. Finally, the police went to an address they thought was the address Frazier gave them for Skeet and found no one who knew of him; however, they went to the wrong address. They did not confirm Walker's alibi, investigate the pawn shop Frazier identified, locate Tony Brown, or contact Frazier's aunt.

The prosecution did not give Dennis the police report of Diane Pugh's interview or any of the reports and other documents relating to Frazier's tip.

Dennis's trial began on October 2, 1992. The prosecution called three eyewitnesses who identified Dennis as the shooter: Howard, Cameron, and Bertha. The prosecution also called Charles Thompson, from Dennis's singing group, who testified that he saw Dennis with a gun the night of the murder. A police detective testified that officers recovered clothing from Dennis's father's house that was similar to what eyewitnesses described the shooter wore. And the prosecution called Latanya Cason, who testified that she saw Dennis at the Henry and Midvale Avenues intersection between 4:00 and 4:30 p.m. on the day of the shooting. The gun and Williams's earrings were never found and so were not presented at trial.

Dennis presented witnesses who corroborated his alibi that he had been with his father before the shooting and took the bus to Abbottsford in the afternoon. Three members of his singing group testified that Charles Thompson was jealous of Dennis. Other witnesses testified to Dennis's good character. Dennis also testified.

A jury found him guilty of first-degree murder, robbery, conspiracy, carrying a weapon without a license, and possessing the instruments of a crime. During the penalty phase, the jury found one aggravating circumstance, that the killing was committed in the course of a felony, and one mitigating circumstance, that Dennis had no significant criminal history. The jury sentenced Dennis to death.

Dennis appealed. During his appeal, in 1997, his new appellate counsel went to the regional Department of Public Welfare ("DPW") office and found Cason's receipt from when she picked up her public-assistance funds on the day of the murder. The receipt indicated that Cason had picked up the funds at 13:03, or 1:03 p.m., earlier than she had testified

at Dennis's trial. Counsel interviewed Cason, and she stated that when the police interviewed her for the first time before trial, the officers already had a copy of the receipt. She stated that she then found her copy of the receipt and that the officers took her copy as well. She also stated that she reviewed the receipt during the interview and likely had been confused by the receipt's use of military time. She thought that because of that confusion, she told the officers the wrong time she saw Dennis on the day of the murder. But based on the correct time from the receipt, she now believed she likely had seen Dennis between 2:00 and 2:30 p.m., as Dennis had told the police during the investigation and testified at trial.

B.

In his direct appeal to the Pennsylvania Supreme Court, Dennis argued, among other things, that he had received ineffective assistance of counsel due to trial counsel's failure to investigate Cason and that the prosecution violated his due process rights when it did not produce the public-assistance receipt before the trial. *See Brady v. Maryland*, 373 U.S. 83 (1963).

The Pennsylvania Supreme Court unanimously rejected both claims.[1] *Commonwealth v. Dennis (Dennis I)*, 715 A.2d 404, 408 (Pa. 1998). The court concluded that Dennis could not succeed on his ineffective assistance of counsel claim because "[Cason's] testimony would not support [Dennis's] alibi, because the murder occurred . . . forty minutes earlier than Cason's earliest estimate" and because her testimony "would have been cumulative" of other

---

[1] Three justices dissented on a different issue, prosecutorial misconduct. *Dennis I*, 715 A.2d at 416 (Zappala, J., dissenting).

9

testimony that Dennis arrived at Abbottsford Homes between 2:15 and 2:30 p.m. *Id.* With respect to Dennis's *Brady* claim, the court stated, "Finally, it is clear that there clearly was no *Brady* violation. The [public-assistance] receipt was not exculpatory, because it had no bearing on Appellant's alibi, and there is no evidence that the Commonwealth withheld the receipt from the defense." *Id.* The court rejected Dennis's other claims and affirmed his conviction and death sentence. *Id.* at 416.

Dennis filed a timely petition pursuant to Pennsylvania's Post Conviction Relief Act ("PCRA"), received new counsel, and also received discovery. In discovery, Dennis received the police report of Diane Pugh's interview, which indicated that Zahra Howard told Pugh that Howard recognized the shooter from her high school. He also received William Frazier's initial statement to the Montgomery County Detective Bureau, his statement to the Philadelphia police, a search consent form Frazier signed, a police report of officers' interview with Ricky Walker, Ricky Walker's statement, and a police report of officers' interview with Frazier's previous landlord (collectively the "Frazier lead documents"). Dennis then amended his petition to include claims that the prosecution violated *Brady* by not disclosing the report of Pugh's interview and the Frazier lead documents. After evidentiary hearings, the PCRA court denied the petition.

Dennis appealed to the Pennsylvania Supreme Court again. The court affirmed the judgment in part, vacated the judgment in part, and remanded for further proceedings. *Commonwealth v. Dennis (Dennis III)*, 950 A.2d 945, 979

(Pa. 2008).[2] With respect to the Frazier lead documents, the court restated its recent precedent interpreting *Brady*, which held that the prosecution did not have to disclose "'every fruitless lead'" and that "'inadmissible evidence cannot be the basis for a *Brady* violation.'" *Id.* at 968 (quoting *Commonwealth v. Lambert*, 884 A.2d 848, 857 (Pa. 2005)). Before *Lambert*, the Pennsylvania Supreme Court had held that *Brady* applied to withheld information that "might have had" an effect on "the preparation of the defense" as well as "the presentation of the defense at trial." *Commonwealth v. Green*, 640 A.2d 1242, 1245 (Pa. 1994). Noting this disagreement in *Dennis III*, the Pennsylvania Supreme Court stated, "*Lambert* indicates that evidence sought under *Brady* must be material and admissible. In the absence of any argument regarding the gravamen of *Lambert* and its effect on the continuing precedential value of *Green*, [Dennis] has failed to establish a basis for relief with regard to this evidence." 950 A.2d at 968.

However, with respect to the police report of Pugh's interview, the court found that there was insufficient evidence in the record and insufficient explanation for the court to affirm the denial of Dennis's *Brady* claim. *Id.* at 969. Accordingly, the court vacated that portion of the PCRA court's order and remanded for further proceedings. *Id.* After

---

[2] The prosecution had filed an interlocutory appeal challenging the PCRA court's grant of discovery on the prosecution's voir dire notes, and the Pennsylvania Supreme Court reversed. *Commonwealth v. Dennis (Dennis II)*, 859 A.2d 1270, 1280 (Pa. 2004). Although the Pennsylvania Supreme Court's 2004 decision is not relevant to this appeal, we refer the court's 2008 decision as *Dennis III* for the sake of completeness.

hearing testimony from Pugh and Howard, the PCRA court again denied Dennis's PCRA petition.

The Pennsylvania Supreme Court affirmed on appeal. *Commonwealth v. Dennis (Dennis IV)*, 17 A.3d 297, 309-10 (Pa. 2011). The court concluded that the police report was not material because "Howard was extensively cross-examined . . . includ[ing] Howard's identification of the shooter" and because "there were two eyewitnesses other than Howard who observed the shooting at close range . . . [and who] positively identified [Dennis] as the shooter in a photo array, in a line up, and at trial." *Id.* at 309. Therefore, the court found that a different result was not reasonably probable. *Id.*

Dennis then filed an application under 28 U.S.C. § 2254 in the United States District Court for the Eastern District of Pennsylvania that raised approximately twenty claims. After full briefing, the District Court granted Dennis a conditional writ of habeas corpus. *Dennis v. Wetzel (Dennis V)*, 966 F. Supp. 2d 489, 518 (E.D. Pa. 2013). The District Court concluded that Dennis was entitled to relief on his *Brady* claims with respect to the Frazier lead documents, Cason's public-assistance receipt, and the police report of Pugh's interview. *Id.* With respect to the Frazier lead documents, the District Court concluded that the Pennsylvania Supreme Court's requirement that evidence be admissible to trigger *Brady* and its determination that the Frazier lead was "fruitless" were unreasonable applications of clearly-established federal law. *Id.* at 503-06. With respect to Cason's public-assistance receipt, the District Court concluded that the Pennsylvania Supreme Court's statement that the receipt was not withheld was an unreasonable determination of the facts and its conclusion that the receipt was not material was an unreasonable application of clearly-established federal law. *Id.* at 508-12. Finally, with respect to

12

the police report of Pugh's interview, the District Court concluded that the Pennsylvania Supreme Court's determination that Howard's cross-examination rendered the report immaterial and its determination that the report would not have affected the other eyewitnesses' testimony were unreasonable applications of clearly-established federal law. *Id.* at 514-17. The District Court also concluded that the Pennsylvania Supreme Court failed to undertake a cumulative materiality analysis as required by United States Supreme Court precedent. *Id.* at 517-18. The District Court withheld ruling on many of Dennis's remaining claims. *Id.* at 491, 501 n.19, & 510 n.27. The Commonwealth filed a timely notice of appeal.

## II.

The District Court had jurisdiction over Dennis's habeas corpus petition under 28 U.S.C. §§ 2241 and 2254. We have appellate jurisdiction under 28 U.S.C. § 1291. Because the District Court did not hold an evidentiary hearing and relied on the state court record, we exercise plenary review and apply the same standard the District Court applied. *Eley v. Erickson*, 712 F.3d 837, 845 (3d Cir. 2013).

Under the Antiterrorism and Effective Death Penalty Act ("AEDPA"), federal courts reviewing a state prisoner's application for a writ of habeas corpus may not grant relief "with respect to any claim that was adjudicated on the merits in State court proceedings" unless the claim (1) "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States" or (2) "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d). "This is a difficult to

13

meet and highly deferential standard for evaluating state-court rulings, which demands that state-court decisions be given the benefit of the doubt." *Cullen v. Pinholster*, ___ U.S. ____, ____, 131 S. Ct. 1388, 1398 (2011) (internal quotation marks and citation omitted). Dennis carries the burden of proving his entitlement to the writ. *Id.*

A decision is "contrary to" federal law if "the state court applies a rule that contradicts the governing law set forth in [Supreme Court] cases" or "if the state court confronts a set of facts that are materially indistinguishable from a decision of [the Supreme] Court and nevertheless arrives at a result different from [Supreme Court] precedent." *Williams v. Taylor*, 529 U.S. 362, 405-06 (2000). A decision is an "unreasonable application" of federal law if the state court identified the correct governing legal rule but applied the rule to the facts of the case in an objectively unreasonable manner. *Renico v. Lett*, 559 U.S. 766, 773 (2010). A decision is based on an "unreasonable determination of the facts" if the state court's factual findings are objectively unreasonable in light of the evidence presented to the state court. *Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003).

Our review of a state prisoner's habeas corpus petition follows a "prescribed path": first, we determine what arguments or theories supported or could have supported the state court's decision; second, we ask "'whether it is possible fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision of the Supreme Court'"; and finally, we ask whether the state court's decision "'was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement.'" *Eley*, 712 F.3d at 846-47 (alterations omitted) (quoting

14

*Harrington v. Richter*, 562 U.S. 86, __, 131 S. Ct. 770, 786-87 (2011)).

Each of the claims at issue in this appeal involves *Brady*, 373 U.S. at 83. *Brady* held that the suppression of material evidence favorable to the defense violates due process. *Id.* at 87. To prove a *Brady* violation, a defendant must show (1) the evidence was favorable to him; (2) the evidence was "suppressed" by the state; and (3) the evidence was material such that the defendant was prejudiced by the failure to disclose it. *Strickler v. Greene*, 527 U.S. 263, 281-82 (1999). Evidence is material if "there is a reasonable probability that the suppressed evidence would have produced a different verdict." *Id.* at 281.

### III.

The District Court held that the Pennsylvania Supreme Court unreasonably applied *Brady* in rejecting Dennis's claims that the prosecution withheld the Frazier lead documents, Cason's public-assistance receipt, and the police report of Pugh's interview. We address whether Dennis is entitled to relief based on each of the three items and conclude that he is not. The Commonwealth has also asked us to remand this case to a different judge. We will not.

### A.

The Pennsylvania Supreme Court held that the prosecution did not violate its disclosure obligations under *Brady* with respect to the Frazier lead documents because Dennis did not show that the documents were admissible and material. *Dennis III*, 950 A.2d at 968. That the documents were inadmissible and immaterial were independent and alternate grounds to reject this claim. Therefore, either ground is capable of defeating Dennis's claim. We find that the

15

admissibility issue disposes of this claim and only address that issue.

To prevail, Dennis must show that the Pennsylvania Supreme Court's requirement that evidence be admissible to trigger *Brady* is contrary to or an unreasonable application of United States Supreme Court precedent. 28 U.S.C. § 2254(d)(1). Dennis has not identified any holding of the Supreme Court that specifically states that evidence does not need to be admissible in order to trigger *Brady* or any Supreme Court case with materially indistinguishable facts. Accordingly, the admissibility requirement is not contrary to Supreme Court precedent.

We also conclude that the admissibility requirement is not an unreasonable application of Supreme Court precedent. The Pennsylvania Supreme Court based its admissibility requirement on the United States Supreme Court's decision in *Wood v. Bartholomew*, 516 U.S. 1 (1995) (per curiam). In *Wood*, state prosecutors had not disclosed the results of a polygraph test that the polygraph examiner opined may have indicated a key witness was not telling the truth. *Id.* at 4. The state courts rejected the defendant's *Brady* claim, and the Supreme Court held that the state courts did not unreasonably apply clearly-established federal law. *Id.* at 4, 9. Specifically, the Court held that *Brady* governs the disclosure of "evidence," "the polygraph results were inadmissible under state law," and therefore the polygraph results were "not 'evidence' at all." *Id.* at 5-6. "Disclosure of the polygraph results, then, could have had no direct effect on the outcome of trial, because [the defendant] could have made no mention of them either during argument or while questioning witnesses." *Id.* at 6.

16

The Ninth Circuit had held that the polygraph results would have given defense counsel "a stronger reason to pursue an investigation" of the defendant's theory and may have uncovered evidence that could have been used at trial. *Id.* at 5 (internal quotation marks omitted). The Supreme Court found that this "speculation" was improper because the defendant's trial counsel indicated that the polygraph results would not have changed his trial preparation. *Id.* at 6-8. The Court concluded,

> In short, it is not "reasonably likely" that disclosure of the polygraph results—inadmissible under state law—would have resulted in a different outcome at trial. Even without [the witness's] testimony, the case against [the defendant] was overwhelming. . . . [In light of the evidence against the defendant], it should take more than supposition on the weak premises offered by [the defendant] to undermine a court's confidence in the outcome.

*Id.* at 8.

The Pennsylvania Supreme Court could reasonably read the *Wood* decision as holding that because the withheld document was not admissible under state law, it was not "evidence" that triggered *Brady*. The remainder of the opinion discussing the Ninth Circuit's reasoning can reasonably be read as dicta, correcting an improperly loose standard in § 2254 cases for when a reasonable probability of a different result exists.

17

Two of our sister courts of appeals have also held that information must be admissible to trigger *Brady*, a fact that confirms our conclusion that the Pennsylvania Supreme Court's interpretation of *Wood* is reasonable. The Seventh Circuit and the Fourth Circuit both agree that *Brady* only applies to information that will be admissible. *See United States v. Morales*, 746 F.3d 310, 314 (7th Cir. 2014) (collecting cases); *Hoke v. Netherland*, 92 F.3d 1350, 1356 n.3 (4th Cir. 1996) (citing *Wood*) ("[T]hese statements may well have been inadmissible at trial . . . and therefore, as a matter of law, 'immaterial' for *Brady* purposes.").

It is irrelevant that the Supreme Court has never expressly limited *Brady* to admissible evidence. And it is irrelevant that we and other courts have held that *Brady* applies to inadmissible information if it is otherwise material. *See Johnson v. Folino*, 705 F.3d 117, 129-30 (3d Cir. 2013). These are not the tests; the test is whether the state court's decision is an *unreasonable application* of clearly-established

federal law *as determined by the Supreme Court of the United States*. 28 U.S.C. § 2254(d)(1).[3]

Our decisions in *Munchinski v. Wilson*, 694 F.3d 308 (3d Cir. 2012), and in *Johnson* are not to the contrary. In *Munchinski*, the Pennsylvania Superior Court rejected the defendant's claims under a heightened materiality standard—that the evidence would change the outcome—and the fact that the withheld information was not admissible was only one factor in that approach. *Munchinski v. Wilson*, 807 F. Supp. 2d 242, 279 (W.D. Pa. 2011). Although we affirmed the district court's grant of habeas corpus relief because the state courts unreasonably applied *Brady*, the final state post-conviction decision did not reject the defendant's *Brady* claim only because the information was inadmissible. Moreover, we did not address whether a state court's requirement that information be admissible under *Brady* would be a reasonable

---

[3] The District Court's analysis of this claim specifically noted that "*most* circuit courts," including this Court, have rejected the premise that inadmissible evidence cannot be a basis for a *Brady* claim. *Dennis V*, 966 F. Supp. 2d at 503 (emphasis added). This circuit majority is irrelevant in a habeas corpus action because the Supreme Court has instructed that "circuit precedent does not constitute 'clearly established Federal law, as determined by the Supreme Court.'" *Parker v. Matthews*, ___ U.S. ____, ____, 132 S. Ct. 2148, 2155 (2012) (per curiam) (quoting 28 U.S.C. § 2254(d)(1)). Furthermore, the "diverging approaches [of the courts of appeals] illustrate the possibility of fairminded disagreement," demonstrating that the Pennsylvania Supreme Court's reliance on the inadmissibility of the evidence was not unreasonable. *White v. Woodall*, ___ U.S. ____, ____, 134 S. Ct. 1697, 1703 n.3 (2014).

application of federal law. And in *Johnson*, the state courts had not addressed the defendant's *Brady* claim on the merits, so we reviewed it in the first instance to determine whether to excuse his default. 705 F.3d at 127-30. Accordingly, we did not hold that an admissibility requirement is an unreasonable application of clearly-established federal law.[4]

We have concluded that the state courts could reasonably require Dennis to show that the Frazier lead documents would be admissible in order to trigger *Brady*'s

[4] Dennis has also drawn our attention to *Gumm v. Mitchell*, ___ F.3d ____, 2014 WL 7247393 (6th Cir. Dec. 22, 2014). We find this case to be inapplicable for similar reasons. First, the State did not attempt to justify denying the defendant's *Brady* claim on the basis that the withheld evidence was inadmissible; the State argued that the evidence was inadmissible *and* was unlikely to lead to admissible evidence. *Id.* at \*17 ("The state's primary argument against the materiality of the undisclosed evidence in this case is that much of it is inadmissible hearsay and *could not have led to the discovery of admissible evidence*." (emphasis added)). Accordingly, this case does not address the question of whether an admissibility requirement is a reasonable application of Supreme Court precedent. And second, the court adjudicated the *Brady* claim in the first instance because the state courts had found they lacked jurisdiction over the claim. *Id.* at \*11. Therefore, the court was not even reviewing a state-court decision. Although the court addressed the claim as though § 2254(d) deference applied, it did so only in dicta. *Id.* at \*23-24. Because the court was not reviewing a state-court decision and was not considering the same question presented to this Court, *Gumm* does not alter or impact our analysis.

disclosure requirement. So if the court concluded that the Frazier lead documents were inadmissible as a matter of state law, then the court could reasonably reject this claim, and we would be unable to grant Dennis relief.

The Pennsylvania Supreme Court found that Dennis did not show that the Frazier lead documents would be admissible. Dennis provides many reasons why the Pennsylvania Supreme Court's decision on admissibility is wrong. However, "a state court's interpretation of state law . . . binds a federal court sitting in habeas corpus." *Bradshaw v. Richey*, 546 U.S. 74, 76 (2005) (per curiam). We cannot reverse the Pennsylvania Supreme Court's decision on a state-law matter. Dennis suggests that this evidence would have been admissible under *Kyles v. Whitley*, 514 U.S. 419, 441-54 (1995). However, in *Kyles*, the Court was predicting how the state courts would rule on the admissibility of prior statements by eyewitnesses. It did not overrule a state court's evidentiary ruling. Dennis also argues that the documents are admissible under *Chambers v. Mississippi*, 410 U.S. 284 (1973). Dennis raises this argument for the first time on appeal, and so he has waived it. *See Del. Nation v. Pennsylvania*, 446 F.3d 410, 416 (3d Cir. 2006) (finding such arguments waived). Even considering this argument on the merits, it fails. *Chambers* was a "highly case-specific error correction," *Montana v. Egelhoff*, 518 U.S. 37, 52 (1996) (plurality opinion) (Scalia, J.), when "mechanistic[ ]" application of hearsay rules that did not include a statement against penal interest exception resulted in the exclusion of exculpatory evidence, *Chambers*, 410 U.S. at 302. Dennis does not challenge the substance of the Pennsylvania hearsay rules or argue that they were applied mechanistically to defeat the ends of justice. Instead, he argues that the Pennsylvania Supreme Court applied the Commonwealth's evidentiary

21

rules incorrectly. That application is a state-court determination of state law by which we are bound.

The Pennsylvania Supreme Court reasonably applied federal law to hold that *Brady*'s disclosure requirement does not apply to inadmissible evidence. And the court found as a matter of state law that the Frazier lead documents were inadmissible. Therefore, Dennis is not entitled to relief on this claim.[5]

B.

We next turn to Latanya Cason's public-assistance receipt. The Pennsylvania Supreme Court held that the prosecution did not breach its obligations under *Brady* because the receipt was not "withheld" and because it was not material. *Dennis I*, 715 A.2d at 408. Again, these are independent reasons why Dennis's claim failed, and if we find that either is a valid basis to reject the claim, Dennis is not entitled to relief. We find that the "withheld" issue resolves this claim.

The record is unclear as to whether the prosecution received Cason's public-assistance receipt. Cason's affidavit says that she gave her copy of the receipt to the police (J.A. 1735), but the police report of their interview with Cason makes no mention of this receipt (J.A. 1529). Even the Pennsylvania Supreme Court's decision is ambiguous. The court stated, "During their investigation, however, the police

---

[5] As we explained initially, the inadmissibility of the Frazier lead documents renders any analysis of the materiality prong of *Brady* unnecessary. Nonetheless, it is worth noting that despite the passage of twenty-plus years, no one has ever located the subject of Frazier's lead, the elusive "Tony Brown."

came into possession of a [DPW] receipt showing that Cason cashed her check at 1:03 p.m." *Dennis I*, 715 A.2d at 408. But the court then immediately characterized its previous statement as "evidence" and ultimately concluded that the receipt was not "withheld." *Id.* Accordingly, it is unclear whether the Pennsylvania Supreme Court found that the prosecution possessed the receipt, and the record is ambiguous as well. Nevertheless, we must give the state court's decision the benefit of the doubt. *Cullen v. Pinholster*, ___ U.S. ____, ____, 131 S. Ct. 1388, 1398 (2011). Accordingly, we ask what arguments could have supported the state court's decision and decide whether those arguments are reasonable. *Eley*, 712 F.3d at 846-47. We find that a valid basis exists in the record to conclude that the receipt was not suppressed in violation of *Brady*.

*Brady* prohibits the "suppression" of exculpatory, material evidence. 373 U.S. at 87. The Pennsylvania Supreme Court and this Court have both interpreted *Brady* to mean that the prosecution does not have to turn over evidence that is also available to the defense with reasonable diligence. *United States v. Perdomo*, 929 F.2d 967, 973 (3d Cir. 1991) ("Evidence is not considered to be suppressed if the defendant either knew or should have known of the essential facts permitting him to take advantage of any exculpatory evidence."); *Commonwealth v. Paddy*, 800 A.2d 294, 305 (Pa. 2002) ("[N]o *Brady* violation occurs if the evidence in question is available to the defense from non-governmental sources or if the defendant knew, or with reasonable diligence could have known, of such evidence." (citations omitted)). Recently, we also concluded that it was reasonable for the Pennsylvania Superior Court to reject a *Brady* claim on a diligence basis. *Grant v. Lockett*, 709 F.3d 224, 231 (3d Cir. 2013). In *Grant*, the prosecution did not disclose that a

23

witness in the defendant's case had three prior convictions and was on parole. *Id.* at 230. The defendant's PCRA counsel discovered these facts during the post-conviction proceedings. *Id.* at 231. We concluded that the state courts reasonably rejected the *Brady* claim because the fact that the PCRA counsel discovered the witness's criminal history by searching public records showed that the trial counsel could have discovered the witness's criminal history with reasonable diligence at the time of trial. *Id.*

Here, Dennis's appellate counsel argued that the receipt was available with "[a] minimal investigation." (J.A. 1800.) Indeed, all indications are that Dennis's appellate counsel, in the process of investigating Cason's statements for purposes of the appeal, went to the DPW and received the receipt without any difficulty. The Pennsylvania Supreme Court could reasonably determine that the receipt was available with reasonable diligence and, therefore, hold that it was not suppressed or withheld in violation of *Brady*.

Dennis argues that the United States Supreme Court's decision in *Banks v. Dretke*, 540 U.S. 668 (2004), rejects a reasonable diligence requirement for *Brady* claims. We disagree. In *Banks*, the prosecution told the defendant that it would produce all exculpatory or favorable evidence in its possession but failed to disclose that one witness was a police informant and that the prosecution had coached another witness on what to say at trial. *Id.* at 675. The prosecution later argued that the defendant had procedurally defaulted her *Brady* claim based on the undisclosed evidence by failing to present it to the state courts and that her procedural default could not be excused because the defendant did not exercise due diligence by interviewing the witnesses in question. *Id.* at 690-91, 695-98. The Supreme Court—noting that the cause and prejudice inquiry to excuse the procedural default merged

24

with the elements of the *Brady* claim—held that the defendant did not need to exercise diligence in the way the state argued to preserve her claim. *Id.* at 698. Accordingly, the defendant showed that the prosecution had suppressed the evidence, giving cause for the default, and the evidence was material, showing prejudice for the default. *Id.*

Even assuming that *Banks* applies—although it was issued after the Pennsylvania Supreme Court decided this claim in *Dennis I*—*Banks* is distinguishable. In *Banks*, the evidence withheld was something that only existed in the possession of the prosecution. The evidence that one witness was a police informant and that another witness had been coached was only available in the prosecution's files. But here, the evidence that Cason received her public assistance at 1:03 p.m. was publicly available from the DPW. And as Dennis himself argued to the Pennsylvania Supreme Court, even a minimal investigation would have uncovered it. In contrast, a minimal investigation in *Banks* would not have uncovered the favorable evidence because the prosecution actively misrepresented what evidence it possessed. *See id.* at 693. We conclude that *Banks* does not render a reasonable diligence requirement for publicly-available information an unreasonable application of clearly-established federal law.

The Sixth Circuit also rejected a similar argument in *Bell v. Bell*, 512 F.3d 223 (6th Cir. 2008) (en banc). In that case, the prosecution did not disclose publicly-available sentencing records that arguably could have demonstrated a witness's bias. *Id.* at 229-31. The court held that state courts could reasonably conclude that the sentencing records were not subject to disclosure under *Brady* because they were publicly available and rejected an argument that *Banks* mandated a different result. *Id.* at 235-36.

25

Dennis also argues that our own precedent does not impose a strict reasonable diligence requirement, but our precedent instead identifies factors that must be considered. Our own precedent cannot constitute clearly-established federal law under § 2254. *Renico*, 559 U.S. at 779. Even if we consider our precedent on this issue to reflect clearly-established Supreme Court precedent, the Pennsylvania Supreme Court's adjudication of this claim is still reasonable. Generally, we have considered the knowledge of the parties, access to the information, and the prosecution's representations in determining whether information was available with reasonable diligence to the defendant. *See United States v. Pelullo*, 399 F.3d 197, 216 (3d Cir. 2005). The Pennsylvania Supreme Court could reasonably determine that those factors suggested that the receipt was available with reasonable diligence here: counsel readily secured the receipt on appeal and Cason's importance as a witness to Dennis's alibi was apparent.[6]

Accordingly, we conclude that the Pennsylvania Supreme Court could reasonably exclude from the prosecution's *Brady* obligations evidence that was available to Dennis with reasonable diligence. And the Pennsylvania Supreme Court could also reasonably determine that Cason's public-assistance receipt was publicly available with reasonable diligence. Therefore, we find that Dennis is not entitled to relief on his *Brady* claim based on Cason's public-assistance receipt.

---

[6] In fact, it is worth highlighting that the prosecution actually learned of Cason from Dennis. Thus, it was reasonable for the prosecution to have believed the defense knew of the evidence.

Dennis alternatively asks us to adjudicate his companion claim: that his trial counsel was constitutionally ineffective in failing to investigate Cason's story, that counsel would have discovered the receipt had he performed the investigation, and that the receipt could have affected the outcome of the proceedings. The District Court specifically reserved judgment on this claim. *Dennis V*, 966 F. Supp. 2d at 510 n.27. We decline to address this claim in the first instance and will allow the District Court to consider this claim on remand. Because we find it unnecessary to address whether Cason's public-assistance receipt was material to Dennis's defense under *Brady*, and in light of the similarity between *Brady* materiality and *Strickland* prejudice—*see Kyles*, 514 U.S. at 436—we will vacate the District Court's determination that the Pennsylvania Supreme Court unreasonably determined that the receipt was not material under *Brady*. The District Court can and should consider Dennis's ineffective assistance claim based on the receipt from a clean slate.

## C.

Dennis's final *Brady* claim concerns a police report of an interview with the victim's aunt, Diane Pugh. The Pennsylvania Supreme Court held that the report was not material because although the report may have been used to impeach Zahra Howard's identification of Dennis as the shooter, no reasonable probability of a different result existed because Dennis cross-examined Howard about her identification of the shooter and two other eyewitnesses identified Dennis as the shooter. *Dennis IV*, 17 A.3d at 463-64. We find that this conclusion is a reasonable application of Supreme Court precedent.

It is true that state courts act unreasonably when holding that merely because a witness "is impeached in one manner, any other impeachment becomes immaterial." *Lambert v. Beard*, 633 F.3d 126, 134 (3d Cir. 2011), *vacated on other grounds sub nom. Wetzel v. Lambert*, ___ U.S. ____, 132 S. Ct. 1195 (2012) (per curiam). However, we have recognized that "impeachment evidence, if cumulative of *similar* impeachment evidence used at trial . . . is superfluous and therefore has little, if any, probative value." *United States v. Walker*, 657 F.3d 160, 186 (3d Cir. 2011) (alteration in original) (internal quotation marks omitted).

Here, using the police report of Pugh's interview arguably would have been cumulative of similar impeachment of Howard's identification of Dennis. On cross-examination, Howard was asked extensively about her identification of Dennis in the photo array and her ability to view and remember the shooting. Of principal relevance, counsel asked her specifically whether she had ever before seen the men who accosted her and Williams. Through it all, Howard maintained that Dennis was the shooter. We conclude that it was reasonable for the Pennsylvania Supreme Court to find that attempting to impeach Howard with the report—essentially what the police said Pugh said Howard said—would have been cumulative of similar impeachment that was actually used at trial, namely challenging Howard's identification of Dennis as opposed to someone she already knew.

*Lambert v. Beard* does not compel a contrary result. In *Lambert v. Beard*, the Commonwealth failed to produce a police report in which a key participant-turned-witness identified three other participants in the crime instead of the two he named at trial. 633 F.3d at 135. The defense had argued that other aspects of the witness's story had changed

but had not questioned the witness about the number of participants, and the prosecution emphasized that the witness consistently identified only two participants in its closing. *Id.* We concluded that it was unreasonable for the state courts to reject the defendant's *Brady* claim merely because other cross-examination on different topics took place. *Id.*

This case is unlike *Lambert v. Beard*. Dennis directly asked Howard whether she had ever seen the shooter before, and she said no. Her answer to that question, the inherent weakness of a multiple-level hearsay document as impeachment evidence, and her insistence on naming Dennis as the shooter render the Pennsylvania Supreme Court's rationale reasonable.

We also find the Pennsylvania Supreme Court's second rationale reasonable. The Supreme Court has "observed that evidence impeaching an eyewitness may not be material if the State's other evidence is strong enough to sustain confidence in the verdict." *Smith v. Cain*, ___ U.S. ____. ____, 132 S. Ct. 627, 630 (2012); *see also Strickler*, 527 U.S. at 293-94 (observing that "there was considerable forensic and other physical evidence linking petitioner to the crime" and that "other eyewitnesses" saw the defendant at the crime scene and concluding that impeachment evidence for one eyewitness was not material). The Pennsylvania Supreme Court could reasonably conclude that this was the case here: two other eyewitnesses testified that Dennis was the shooter, decreasing the probability that impeaching Howard's identification would affect the outcome.

This conclusion is not contrary to or an unreasonable application of *Kyles*. In *Kyles*, withheld police reports suggested that two of four eyewitnesses to the crime had changed their story over time. 514 U.S. at 441-45. *Kyles* is

29

arguably distinguishable in three key ways and, therefore, does not render the state court's decision unreasonable or contrary to clearly-established federal law. First, in *Kyles*, the police reports were based on interviews of the eyewitnesses themselves. Here, the withheld police report was based on what someone else said the eyewitness told her. This distance decreases the impeachment value of the report. Second, in *Kyles*, the remaining eyewitnesses "had their best views of the gunman only as he fled the scene with his body partly concealed in [a] car." *Id.* at 445. Here, Bertha, the construction worker, stepped toward the shooter after Williams was shot, and the shooter raised the gun in Bertha's direction. (J.A. 540-41.) Bertha was "three or four feet" from the shooter. (J.A. 541; J.A. 542.) And finally, in *Kyles*, the police reports about the eyewitnesses' statements were a few documents among a wide variety of evidence withheld. The Court determined that all of these materials together undermined its confidence in the verdict. 514 U.S. at 454. Here, this police report of Pugh's interview is the only evidence whose materiality required consideration, given the Pennsylvania Supreme Court's reasonable adjudication of the other *Brady* claims. [7] Accordingly, we conclude that *Kyles* does not make the Pennsylvania Supreme Court's decision on this withheld evidence an unreasonable application of or contrary to clearly-established federal law.

Dennis also argues that the Pennsylvania Supreme Court misstated the facts in its opinion by implying that Dennis attended the same high school as Williams and

---

[7] In light of the Pennsylvania Supreme Court's reasonable disposition of the previous two *Brady* claims, we conclude that the court did not need to inquire into the cumulative materiality of the three pieces of evidence.

Howard and did not consider two of Dennis's arguments. We first find that the court did not get the facts wrong. The court noted that the police report suggested Howard recognized the shooter from her high school. *Dennis IV*, 17 A.3d at 306. Later, while summarizing the PCRA court's findings, the court stated that Howard denied knowing Dennis or telling anyone that she knew Dennis. *Id.* at 309. At the PCRA hearing, Howard testified not only that she did not know Dennis but also that she did not know the assailants and never told anyone that she did know them. (J.A. 1467.) The Pennsylvania Supreme Court's decision to equate Dennis with the shooter, as all proceedings up to that point had confirmed, did not mean that the court decided the claim on incorrect facts. Moreover, the court's decision makes clear that it understood Dennis was arguing that the shooter was someone other than Dennis whom Howard recognized and that the court rejected that argument.

Second, the court did consider all of Dennis's arguments. The court noted that Dennis argued that the report "could have led to new investigative avenues" and also "could have led counsel to alter his investigative strategy." *Dennis IV*, 17 A.3d at 307. Thus, the court understood Dennis was claiming that the report could impeach the police's investigation of the murder and that the report could have assisted counsel's trial preparation but nonetheless rejected the claim. Considering what arguments might have supported this rejection, *see Eley*, 712 F.3d at 846-47, we conclude that the rejection was reasonable. That the police heard of this alternate identification through a third party and that Howard identified Dennis more than once even though she did not know him would allow the police to reasonably conclude that either Pugh was mistaken in a time of grief or that the officers simply transcribed Pugh's statement incorrectly. And given

that counsel already focused on whether Howard was sure that Dennis was the shooter at trial, the Pennsylvania Supreme Court could reasonably conclude that the report would have minimal impact on Dennis's trial preparation.

For these reasons, the Pennsylvania Supreme Court reasonably rejected Dennis's final *Brady* claim.

D.

Before we conclude, we must address one final matter. The Commonwealth has asked us to remand this case to a different judge. The Commonwealth complains that the District Court made comments about Dennis's possible innocence and about the investigation into Williams's murder that demonstrate the appearance of impropriety. We will deny the Commonwealth's request.

In our *en banc* decision in *Boyd v. Waymart*, 579 F.3d 330, 333 (3d Cir. 2009) (en banc), we remanded a case to a different judge to avoid the appearance of impropriety. We did so because we remanded an issue that the district court had already decided for a new decision, and we wished to avoid the appearance of impropriety that might result should the district court again reach the same conclusion on the same issue. *Id.* at 339 n.10 (Scirica, C.J., concurring). This is, however, "an extraordinary remedy that should seldom be employed." *United States v. Bergrin*, 682 F.3d 261, 282 (3d Cir. 2012).

Here, we do not believe reassignment is necessary. We have finally resolved all of the claims the District Court decided, and our remand will not require the District Court to decide the same issues or claims it previously decided. Rather, it will decide the remaining claims that it has not yet considered. We are confident that the District Judge—an

32

experienced, learned, and fair jurist—will be able to apply the proper legal standards to the remaining claims.

## IV.

For the reasons set forth above, we will vacate the District Court's order granting Dennis a conditional writ of habeas corpus and remand the case for consideration of Dennis's remaining claims in a manner consistent with this opinion.