# Illinois Official Reports

## Appellate Court

<div style="border:2px solid black">

### *People v. Del Prete*, 2017 IL App (3d) 160535

</div>

| | |
|---|---|
| Appellate Court Caption | THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellant, v. JENNIFER DEL PRETE, Defendant-Appellee. |
| District & No. | Third District<br>Docket No. 3-16-0535 |
| Filed | November 8, 2017 |
| Decision Under Review | Appeal from the Circuit Court of Will County, No. 03-CF-199; the Hon. Carla A. Policandriotes, Judge, presiding. |
| Judgment | Affirmed. |
| Counsel on Appeal | James W. Glasgow, State's Attorney, of Joliet (Patrick Delfino, Lawrence M. Bauer, and Thomas D. Arado, of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People.<br><br>Patrick W. Blegen, Jodi L. Garvey, and Lisa L. Wood, of Blegen & Garvey, of Chicago, for appellee. |
| Panel | PRESIDING JUSTICE HOLDRIDGE delivered the judgment of the court, with opinion.<br>Justices Lytton and McDade concurred in the judgment and opinion. |

**OPINION**

¶ 1    The State appeals the circuit court's order granting the successive postconviction petition filed by the defendant, Jennifer Del Prete. Specifically, the State argues that the defendant failed to establish a *Brady* violation based on the State's failure to disclose a letter written by the lead detective in her case because there was no reasonable probability that the result of the trial would have been different had the letter been disclosed.

¶ 2                                FACTS

¶ 3    In 2004, the defendant was charged with first degree murder (720 ILCS 5/9-1(a)(2) (West 2002)) in that she shook I.Z., a 3½-month-old infant, knowing that such acts created a strong probability of death or great bodily harm to I.Z. and thereby causing the death of I.Z. The defendant was a day-care provider, and the charges resulted from an incident at the day care.

¶ 4    A bench trial was held. Barbara Z., I.Z.'s mother, testified that I.Z. was born on September 6, 2002. On December 27, 2002, Barbara dropped I.Z. off at day care. I.Z. was developmentally normal when Barbara dropped her off. Barbara did not harm I.Z. before dropping her off at day care, and she did not see her husband harm I.Z. The next time Barbara saw I.Z. was later that day at Provena St. Joseph Medical Center (Provena). I.Z. was transferred to the University of Illinois at Chicago Hospital (UIC). I.Z. remained there for three weeks. I.Z. was then transferred to Children's Memorial Hospital. I.Z. remained there for several weeks. I.Z. returned home on March 23, 2003. Barbara received help caring for I.Z. from nurses who came to her home. On the morning of November 8, 2003, the nurse who was caring for I.Z. called for Barbara. Barbara saw that I.Z.'s lips were blue, and she called 911. I.Z. died the next day.

¶ 5    Detective Kenneth Kroll testified that he investigated I.Z.'s case. He interviewed the defendant on December 29, 2002. The defendant told Kroll that she was the only one working on December 27, 2002, because the other day-care provider was out of town. The defendant said that after Barbara dropped I.Z. off that day, I.Z. took a bottle between 8 and 9 a.m. I.Z. then slept in a swing until around noon. At that time, I.Z. had "an extremely dirty diaper." The defendant changed I.Z.'s diaper and set her down on the couch. The defendant stepped away for a moment to prepare a bottle for I.Z. When the defendant returned to the couch, I.Z. "was making a snoring, labored breathing sound" and her body was "totally limp." The defendant picked I.Z. up, and her head flopped forward. The defendant gave I.Z. a "very slight shake" while saying her name several times. The defendant tried to feed I.Z., but the milk ran out of her mouth down the side of her face. The defendant then positioned I.Z. face down and gave her three to five pats on the back in an attempt to dislodge anything that might have been choking I.Z. The defendant felt panicked, and she called 911. The defendant said that I.Z. did not fall or get knocked over that day. The defendant said that I.Z.'s head moved more violently when she was patting I.Z. on the back than when she gave I.Z. the slight shake.

¶ 6    Kroll took a break during the interrogation. When he returned, he told the defendant that her statements were not consistent with the medical evidence. Kroll said that I.Z. suffered from shaken baby syndrome (SBS) and subdural hematomas. Kroll told the defendant that he believed she was involved in I.Z.'s injuries. The defendant began to cry. She said she could not remember exactly what happened and that it was a very stressful, panicked situation. The

- 2 -

defendant told Kroll "she could have shaken [I.Z.] a little harder than she thought." The defendant maintained that she did not shake I.Z. violently, and she did not intentionally hurt I.Z. Kroll acknowledged that he documented in his report that the defendant never actually confessed to shaking I.Z.

¶ 7 Dr. Adrian Nica, a physician at Provena, testified that he treated I.Z. in the emergency room on December 27, 2002. Nica ordered a CAT scan of I.Z.'s brain, which showed that I.Z. had an "acute and chronic changes secondary to bleeds in different levels." Nica said that the chronic bleeding could have been days or a week old. Nica testified that because I.Z. had not been involved in a car accident, "you have to assume that it was a child abuse or baby shaking." The defendant objected. The circuit court allowed Nica's testimony that he believed the bleeding was caused by child abuse or baby shaking for the limited purpose of explaining his course of treatment, not for "the truth of the matter asserted as it relates to expert diagnosis."

¶ 8 Dr. Howard Hast was certified as an expert in the field of pediatric critical care medicine. Hast testified that he treated I.Z. from December 30, 2002, through January 16, 2003. A retinal scan showed that there was blood in I.Z.'s retinas, in front of the retinas, and in the vitreous. I.Z. also had bifrontal subdural hematomas. Hast performed several tests to attempt to determine a cause of the subdural hematomas. He found no bleeding tendency or metabolic diseases that would explain the cause of the bleeding. Hast opined that the most likely cause of the bilateral subdural hematomas was that I.Z. "was shaken or had some other accelerating/decelerating injury occur such as being dropped or thrown or something like that."

¶ 9 Dr. Jeff Harkey testified that he was employed as a forensic pathologist by the Du Page County coroner's office. The court certified Harkey as an expert in the field of forensic pathology. Harkey testified that he conducted I.Z.'s autopsy on November 10, 2003. Harkey took X-rays of I.Z. The X-rays showed no evidence of trauma. Harkey also examined I.Z.'s brain. He did not observe any bleeding or acute trauma. Harkey reviewed some of I.Z.'s medical records, including a physician's report from Dr. Emalee Flaherty. Harkey determined that I.Z.'s cause of death was "multiple system organ failure due to anoxic-ischemic injuries *** that was due to abusive head trauma [(AHT)]." Harkey stated that an anoxic-ischemic injury occurred when there was not enough blood flow and oxygen to bodily tissue. Harkey testified that I.Z.'s AHT occurred 10 or 11 months prior to her death. Harkey opined: "I believe that the reason that [I.Z.] suffered the injury the day before she died was a direct result of the injury that she suffered the 10 to 11 months before." Harkey observed no evidence of old trauma during his autopsy, and his conclusion that I.Z. suffered AHT was due to Flaherty's report.

¶ 10 Flaherty testified that she had been a pediatrician at Children's Memorial Hospital for over 30 years. The court qualified Flaherty as an expert in the areas of pediatrics and child abuse. Flaherty testified that she reviewed I.Z.'s medical records from UIC. She also spoke with Hast, reviewed the police reports, reviewed the paramedic reports, interviewed I.Z.'s parents, and examined I.Z. Flaherty concluded that I.Z. "had suffered [AHT] or also known to many people as [SBS]." Flaherty stated: "[AHT] is a form of child abuse where a child suffers some kind of acceleration/deceleration injuries to the brain that cause some—or for example, shaking, and cause the unconstillation [sic] of injuries." Flaherty stated that AHT

could be caused by "violent sustained shaking and sometimes impact" to infants or young children. Flaherty said that AHT was most commonly caused by shaking.

¶ 11 Flaherty showed a PowerPoint presentation to explain AHT. Flaherty showed a slide that contained the "spectrum of injuries you can see in [AHT] or [SBS]." Of those symptoms, I.Z. had subdural hemorrhages, subarachnoid hemorrhages, diffusing injury, and parenchymal lacerations and contusions. Flaherty stated that I.Z. suffered from encephalomacia, or dead brain tissue, as a result of her injuries. Flaherty stated that acceleration/deceleration forces like violent shaking can also cause retinal hemorrhages, which I.Z. had. Flaherty opined that "when you see hemorrhages to the ora serrata as in [I.Z.'s] case, those kinds of extensive hemorrhages are only caused by these acceleration/deceleration forces or seen in [SBS]."

¶ 12 Flaherty further opined that "extensive subdural hematomas like [I.Z.] had over extensive areas of the head, those are only caused by acceleration and deceleration forces. For example, shaking would be an example." The prosecutor asked Flaherty what level of force would be needed for violent shaking to cause these injuries. Flaherty responded: "Forces would be so severe that if anyone witnessed that shaking occurring or someone shaking a child like that, they would know that that child would suffer severe injury." The prosecutor asked Flaherty if she could offer a time frame as to when the abuse to I.Z. occurred. Flaherty replied:

> "Oh, yes. On the day of the 27th sometime after—[I.Z.] was described eating normally in the morning, and sometime after she awoke and was reported to be smiling but crabby. About—awoke about 1 o'clock and reported to be smiling and crabby again which tells us she had not suffered severe brain injury at that point, and just before she lost consciousness and became unresponsive."

¶ 13 Flaherty stated that the effects of the abuse would have been immediate. Flaherty opined that I.Z.'s injuries could not have been caused by someone performing cardiopulmonary resuscitation (CPR) poorly on her, from a fall, or by a young child. Flaherty stated that "[i]t would take someone of adult strength shaking this child violently to cause these kinds of injuries."

¶ 14 Flaherty acknowledged that I.Z. did not have any bruises. Flaherty stated that bruises on the arms and trunk are not part of the definition of SBS. Flaherty said that she would typically look for any bruises while conducting an SBS analysis, but it was "pretty uncommon" to find bruising in a case of SBS. Flaherty did not know why.

¶ 15 The State rested.

¶ 16 The defendant called Dr. Wayne Tucker. The court qualified Tucker as an expert in pathology and pediatrics over the State's objection. Tucker testified that he reviewed medical records, Flaherty's report, police reports, paramedics' reports, an autopsy report, and autopsy pictures. Based on his review of these documents, Tucker opined that I.Z.'s injuries occurred approximately 18 to 24 hours before she collapsed at the day care. Tucker reasoned that I.Z.'s CAT scan "reflected that there was an acute situation and there was a chronicity to the situation of the frontal hematomas, subdural." Tucker stated that "chronic" meant that it had been there for "at least 7 to 10 days." Tucker opined that "[a]lmost anything that will cause an increase in intracranial pressure" could cause a chronic subdural hematoma to rebleed. Tucker gave the examples of coughing, sneezing, holding breath, movement, turning the head quickly, or falling.

- 4 -

¶ 17    Tucker stated that the fact that I.Z. took a bottle the morning she collapsed "does not rule out any problem at that time because the sucking reflex of an infant overcomes any damage that might—a child may have cerebral or physically." Tucker noted that I.Z.'s history showed that she had problems taking bottles generally.

¶ 18    Tucker stated that bruising was part of the definition of SBS. Tucker explained that "to do this even on a three month old or a one month old or any age group *** whoever is doing it has to pick up into the arms, say hold arms or the shoulders and grab and hold on tightly to give the shaking." Tucker stated that he had never seen a shaken baby without bruising. Tucker had previously testified in three SBS cases.

¶ 19    The defense rested.

¶ 20    During closing argument, the State argued:

"Dr. Flaherty comes in as a fully qualified expert in the field of pediatrics and child abuse medicine. She comes in and she explains and teaches this Court what [AHT] is, a rapid acceleration and deceleration of the head which causes very distinct and specific injuries. These injuries are telltale signs and solely towards what is commonly referred to as [SBS]."

The State further argued:

"This all happens, Judge, on [the defendant's] watch of [I.Z.] Dr. Flaherty testified very clearly, the injuries are immediate. This is not something that happens hours or days before. This is something that happens when you cause this type of injury this severe. The effect is immediate. In the morning [I.Z.] is fine. She is able to eat. She is able to take a bottle between 8 and 9 o'clock from [the defendant]. That means that these core functions in the blue area as she described have not been injured yet. It is to this point, Judge, where [I.Z.] is fine.

***

*** The abrupt change signifies when this injury occurred, and that is between 12:00 and 1:30 when the 911 call was made. That puts it squarely on [the defendant's] hands.

Dr. Flaherty testified five years old and under, they can't do this. A fall from a swing can't do this. An accident can't do this. This is a violent shaking. A violent back and forth acceleration/deceleration of the head, that's what happened here, Judge."

¶ 21    The circuit court found the defendant guilty of first degree murder and sentenced her to 20 years' imprisonment.

¶ 22    On direct appeal, we affirmed the defendant's conviction. *People v. Del Prete*, No. 3-05-0868 (2007) (unpublished order under Supreme Court Rule 23). The defendant filed a postconviction petition alleging that she received ineffective assistance of counsel. The circuit court summarily dismissed the petition, and we affirmed the summary dismissal. *People v. Del Prete*, 3-08-0431 (2009) (unpublished order under Supreme Court Rule 23).

¶ 23    The defendant filed a motion for leave to file a successive petition for postconviction relief. The motion alleged that the defendant recently discovered the existence of a letter written by Kroll (the Kroll letter) that the State failed to disclose prior to trial. Journalism students at Northwestern University obtained the Kroll letter through a Freedom of

Information Act (FOIA) request. The Kroll letter was dated November 10, 2003, and was addressed to Flaherty.[1] The Kroll letter stated:

> "If you haven't already heard, [I.Z.] died 11-09-03. I'm writing to inform you of a 'twist' in our case presented by the DuPage County Medical Examiner. On 11-09-03, I received a phone call from an Attorney who notified me that [I.Z.] would undergo a 'post' medical exam on 11-10-03. This Attorney specifically called to inform me that the pathologist scheduled to perform the autopsy does not agree with SBS, and has testified for the defense in two DuPage County SBS cases.

> On 11-10-03, I spoke to a Plainfield Police Evidence Tech (ET) who was present at the autopsy. The ET advised that Dr. Jeff Harky [*sic*] did in fact question the diagnosis of SBS. I was told that Dr. Harky specifically looked for fractures in the rib cage (adult grabbing point) and found none. Dr. Harky intends to summons all of [I.Z.'s] medical records to see who determined this was SBS, and why they reached that diagnosis.

> I have great confidence in your findings, and our investigation. This correspondence is FYI. However, I anticipate having to answer several questions for my prosecuting Attorney. Please call me when you have a few minutes to discuss the case.

> THANKS!!!"

The defendant's motion for leave to file a successive postconviction petition argued that the State's failure to disclose the Kroll letter violated the rule set forth in *Brady v. Maryland*, 373 U.S. 83 (1963). The motion also set forth a claim of actual innocence.

¶ 24 The circuit court denied the defendant's motion, finding that the defendant had not demonstrated sufficient cause and prejudice. We reversed the ruling of the circuit court and remanded the matter for further postconviction proceedings. *People v. Del Prete*, 2015 IL App (3d) 140007-U.

¶ 25 On remand, the defendant filed a successive postconviction petition. In the petition, the defendant argued that the State's failure to disclose the Kroll letter constituted a *Brady* violation. The petition also set forth an actual innocence claim based on the Kroll letter and testimony presented in the defendant's federal *habeas corpus* proceedings, including Harkey's testimony that he was unaware at the time of the autopsy that I.Z. had a chronic subdural hematoma. The petition advanced to the third stage of proceedings, and an evidentiary hearing was held.

¶ 26 The parties stipulated as to the admission of the transcript of the testimony from a hearing held on June 21, 2013, in the defendant's federal *habeas corpus* case. At that hearing, Harkey testified that he had "no independent recollection" of expressing doubts regarding the diagnosis of SBS in I.Z.'s case. At the time of I.Z.'s autopsy in 2003, Harkey had general disagreements with SBS. Specifically, Harkey stated: "The name of the syndrome implies a mechanism that I don't believe can be separated from blunt force trauma." Harkey explained:

---

[1]The name of the addressee was redacted from the copy of the Kroll letter obtained pursuant to the FOIA request. However, testimony in the defendant's federal *habeas corpus* proceedings established that the Kroll letter was addressed to Flaherty.

"So when you see a constellation of injuries in a child, I don't have faith in somebody being able to say this head injury came from shaking and not from blunt force trauma. It is possible that they have reason to believe that it's shaking because of neck injury, that the neck injury might have caused the head injury, and in that case, then they have a reason to do it. Then they have a reason to say this is shaken baby type of injuries. If they catch the whole thing on a nanny cam, they have got a reason to say this is shaken injuries.

But when I am looking at pathology in an autopsy, I don't believe that I can say this child was shaken rather than this child was hit."

Harkey stated that the term AHT did not describe a specific mechanism of injury and could include injury as a result of blunt force trauma, shaking, or a combination of both. Blunt force trauma does not necessarily leave a visible sign of injury or result in bruising or fractures.

¶ 27　　Harkey stated that he also had a problem with a diagnosis of SBS or AHT regarding the ability to pinpoint a perpetrator. Harkey explained:

"The problem with head injuries is a child can go unresponsive at a time that is remote—depending upon the type of injury—that is remote from the actual injury, and so if the child has been in the care of a number of different people, which one inflicted the trauma that eventually led to the child's collapse.

With the shaken baby philosophy, this was supposed to solve all of our problems because it's obvious that the type of injury that you get from shaking is going to make the baby go unresponsive immediately. And, therefore, it's whoever the baby was with that is the perpetrator. And that would be magic for us. We could solve lots of problems.

The problem is—

And solve lots of problems, that is, as to who did it.

But the problem that I have with it is that the people that purport to be able to say these injuries are due to shaking and not due to blunt trauma that may have occurred earlier, I don't agree with them. I don't agree that they're able to divine that."

¶ 28　　Harkey opined that "all of those injuries that you can find with shaking, you can find with blunt trauma." Harkey believed that an infant with subdural hematomas, retinal hemorrhages, and brain swelling could drink milk from a bottle before collapsing. Harkey stated that an infant's ability to feed could be useful to pinpointing the perpetrator in some cases, "but it's not black and white, one or the other." Harkey said that if a baby were thrown onto a couch or fell on a soft surface, there could be a lucid period in which the baby would not immediately collapse. Harkey had these opinions in 2003 and 2005 and would have testified accordingly at the defendant's trial had he been asked during his testimony.

¶ 29　　Harkey testified that his determination as to I.Z.'s cause of death had nothing to do with his autopsy findings. Rather, he relied on the conclusions of other doctors. Harkey was not aware that I.Z. had a chronic subdural hematoma at the time he arrived at his opinion regarding I.Z.'s cause of death. Defense counsel advised him of this fact.

¶ 30　　The defendant also called Harkey as a witness at the evidentiary hearing for her successive postconviction petition. Harkey again testified that when he conducted I.Z.'s autopsy, he was unaware that she had a chronic subdural hematoma. Harkey explained that a

chronic subdural hematoma is a collection of blood in the subdural space that is three weeks old or older. Harkey said that he had records from Provena at the time of the autopsy, but he did not have the radiologist's report that noted the chronic subdural hematoma.

¶ 31　　Harkey stated that he concluded at the time of the autopsy that I.Z.'s cause of death was "multi-system organ failure due to anoxic ischemic injury as a result of [AHT]." However, if Harkey had known that I.Z. had a chronic subdural hematoma, he would have stated that her cause of death was multi-system organ failure due to anoxic-ischemic injury as a result of acute and chronic subdural hematomas. Harkey stated that the rebleeding of a chronic subdural hematoma could cause acute subdural hematomas and could cause a child to collapse. Harkey testified that it was possible for a chronic subdural hematoma to rebleed spontaneously not due to trauma. Harkey explained:

> "When it rebleeds spontaneously, it increases in size. It could also be an irritant to the surface of the brain when there is—if there is pressure on the brain, there could be seizures. All of the things that happened to the baby suddenly at the babysitter's house could be a result of a rebleed. Just raising that possibility of a rebleed in a chronic subdural hematoma draws doubt that there was physical abuse that was rendered that day because it's not necessary for that to happen for chronic subdural hematomas to rebleed."

¶ 32　　Harkey stated that he had reviewed Flaherty's report at the time of I.Z.'s autopsy, and it was one of the records he relied on in determining I.Z.'s cause of death. Harkey noted that the report stated that I.Z. had acute subdural hematomas, but it did not mention a chronic subdural hematoma. Flaherty's report concluded that I.Z.'s injuries were caused by child abuse and occurred immediately before I.Z.'s abrupt change in mental status. Harkey stated that he did not agree with Flaherty's conclusions because the chronic subdural hematoma did not occur immediately prior to I.Z.'s abrupt change in mental status. Harkey explained that Flaherty's "facts [did] lead to her conclusions, but because there is a change in facts that there is a chronic subdural hematoma, that changes the conclusion."

¶ 33　　Harkey testified that he did not agree with the term SBS at the time of I.Z.'s autopsy because it implied a mechanism that is not supported by physical findings. Harkey stated that the head injuries a child suffers in SBS are no different than head injuries caused by a blow to the head, so there was no way to determine from the head injuries whether the baby was shaken or hit. There was good reason to believe a baby had been shaken if the baby had neck injuries, but I.Z. did not have neck injuries.

¶ 34　　The following exchange occurred between defense counsel and Harkey:

> "Q. Do you also have any issue with [SBS] or [AHT] as it relates to pinpointing a perpetrator of the abuse of a child?
> A. Yes.
> Q. Tell us what that issue is.
> A. Part of the [SBS] philosophy is that the child sustains severe neurological injury that is called a diffuse axonal injury and becomes immediately unresponsive. Therefore, it makes it very obvious that whoever the baby was with at the time is the one that inflicted the injury.
> Q. Do you think that that's correct?

A. I think that babies can become unresponsive from old trauma such as a subdural that rebleeds, as we have already talked about. The sequela of that leads to brain swelling from that anoxic injury, leads to brain swelling and retinal hemorrhages and all of the findings that are purported to be from [SBS].

Q. If someone had testified at [the defendant's] trial back in 2005 that [the defendant] must have been the perpetrator of this offense because the baby collapsed in her presence and custody, would you have agreed or disagreed with that?

A. I would have disagreed. Let's see. Do I know about the chronic?

Q. Yes.

A. I do know about the chronic at that time?

Q. Right.

A. I would have disagreed with that.

Q. Do you agree that in the time between a—the existence of a chronic subdural hematoma and its rebleeding to collapse, a baby could feed and take a bottle and be relatively normal?

A. Yes."

¶ 35    When asked again on cross-examination if he had a problem with SBS or AHT in that it pinpointed the perpetrator as the last person with the child before the child collapsed, Harkey responded:

"Yeah. That's not considered to be a problem. That would be—you know if—It would make investigations incredibly easy. You can identify them. If you can find this magic thing that happens only with shaking and you can't get it any other way, that's called pathognomonic. If you have a pathognomonic finding and the baby goes immediately unresponsive, with that pathognomonic finding, it happened acutely.

It's what we are seeking. It's what we would like to find is something pathognomonic. That would make things better. So I don't have a problem with them finding something someday. I would love if they did find something. I just don't think it's been found yet. If it were found, it would be very helpful for pinpointing the perpetrator."

¶ 36    Harkey testified that it was possible for a baby to become unresponsive immediately after a severe head trauma caused by shaking, shaking and impact, or blunt trauma. A baby could have a delayed collapse if the shaking or impact caused some injury but not extensive subdural hematomas or axonal injury. It was possible for a baby to suffer a relatively minor injury, get a subdural hematoma, and not collapse for a significant period of time. A baby could also collapse, recover, and act normal for a long time.

¶ 37    Harkey stated that if a baby died quickly following a head injury, he would look for fractured ribs and bruises on the rib cage from adult grabbing points. He did not look for bruises or fresh fractures in I.Z.'s case because she died 9 or 10 months after she collapsed. Harkey found no evidence of old fractures. Harkey stated that a baby could suffer from AHT without having rib fractures or bruising.

¶ 38    Charles Bretz, defendant's trial counsel, testified at the evidentiary hearing that the State did not turn over the Kroll letter to him prior to trial. At the time of the defendant's trial, Bretz "had no idea" that Harkey did not agree with SBS or that he had previously testified for the defense in any SBS cases. Bretz testified that if he had known the information contained

in the Kroll letter, he would have attempted to interview Harkey. Bretz would have asked Harkey about the lack of adult grabbing points on I.Z., Harkey's testimony in prior SBS cases, why Harkey questioned the SBS diagnosis in other cases, and Harkey's concerns with the general validity of an SBS diagnosis. Bretz would have attempted to obtain the transcripts from other SBS cases in which Harkey testified. Bretz did not do these things because there was no indication that Harkey had an opinion other than that I.Z. died of SBS. Harkey appeared to be "completely aligned with the State's theory of the case and the opinion of their expert, Dr. Flaherty."

¶ 39    Bretz stated that his cross-examination of Harkey would have been different if Bretz had known about the Kroll letter. Specifically, Bretz would have questioned Harkey about SBS and Harkey's concerns about the lack of validity of such a diagnosis. Bretz would have also questioned Harkey about questions he raised at the time of the autopsy and why his final report did not mention any of his doubts or concerns regarding SBS in I.Z.'s case or in general.

¶ 40    Bretz also testified that if the State had given him the Kroll letter, he would have given it to Tucker and asked him to comment on it. Bretz would have asked Tucker what questions he should ask Harkey during a pretrial interview or during cross-examination. Bretz would have also sought out additional medical experts regarding concerns they had with the SBS diagnosis in I.Z.'s case. Additionally, Bretz would have recommended that the defendant take a jury trial rather than a bench trial if the State had given him the Kroll letter. Bretz testified that he believed Harkey knew about I.Z.'s chronic subdural hematoma because his report stated that he reviewed the records from Provena.

¶ 41    After the hearing, the circuit court granted the defendant's successive postconviction petition and ordered a new trial.

¶ 42                                ANALYSIS

¶ 43    The State argues that the circuit court erred in granting the defendant's successive postconviction petition. We will not reverse the circuit court's decision following a third-stage evidentiary hearing on a postconviction petition where fact finding and credibility determinations are involved unless the decision is manifestly erroneous. *People v. Pendleton*, 223 Ill. 2d 458, 473 (2006). " 'Manifest error' is defined as 'error which is "clearly evident, plain, and indisputable." ' " *People v. Ortiz*, 235 Ill. 2d 319, 333 (2009) (quoting *People v. Morgan*, 212 Ill. 2d 148, 155 (2004), quoting *People v. Johnson*, 206 Ill. 2d 348, 360 (2002)). "Thus, a decision is manifestly erroneous when the opposite conclusion is clearly evident." *People v. Coleman*, 2013 IL 113307, ¶ 98.

¶ 44    We first address the defendant's *Brady* claim. "A *Brady* claim requires a showing that: (1) the undisclosed evidence is favorable to the accused because it is either exculpatory or impeaching; (2) the evidence was suppressed by the State either wilfully or inadvertently; and (3) the accused was prejudiced because the evidence is material to guilt or punishment." *People v. Beaman*, 229 Ill. 2d 56, 73-74 (2008). "Evidence is material if there is a reasonable probability that the result of the proceeding would have been different had the evidence been disclosed." *Id.* at 74. The materiality inquiry " 'is not a sufficiency of evidence test' " (*People v. Coleman*, 183 Ill. 2d 366, 393 (1998) (quoting *Kyles v. Whitley*, 514 U.S. 419, 434 (1995))) and "a showing of materiality does not require demonstration by a preponderance that disclosure would have resulted ultimately in defendant's acquittal." *Id.* "Materiality is

demonstrated 'by showing that the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict.' " *Id.* (quoting *Kyles*, 514 U.S. at 435).

¶ 45    In the instant case, the Kroll letter was favorable evidence. The Kroll letter showed that the lead investigator in the case learned that Harkey initially questioned I.Z.'s SBS diagnosis, disagreed with SBS in general, found the lack of adult grabbing points on I.Z. to be significant, and testified for the defense in two SBS cases.

¶ 46    Regarding the second prong in our *Brady* analysis, it is undisputed that the Kroll letter was not turned over to the defense. Additionally, Bretz testified that he was not aware of the information contained in the Kroll letter.

¶ 47    We turn our attention to the third factor in our *Brady* analysis, namely, whether the Kroll letter was material to guilt or punishment. As we discussed in our prior decision in *Del Prete*, 2015 IL App (3d) 140007-U, ¶¶ 39-40, even if the withheld evidence is itself inadmissible, it may still be material evidence under *Brady* if it would have led to the discovery of admissible evidence. Our supreme court implicitly recognized this in *People v. Olinger*, 112 Ill. 2d 324, 342-43 (1986), when it held that the undisclosed evidence in that case could not have affected the outcome of the trial because it was inadmissible and the defendant could point to no admissible evidence the withheld information *would have led to*. Additionally, this is the approach of a majority of the federal circuit courts. See *Johnson v. Folino*, 705 F.3d 117, 130 (3d Cir. 2013) ("[I]nadmissible evidence may be material if it could have led to the discovery of admissible evidence."); *Ellsworth v. Warden*, 333 F.3d 1, 5 (1st Cir. 2003) ("[W]e think it plain that evidence itself inadmissible could be so promising a lead to strong exculpatory evidence that there could be no justification for withholding it." (Emphasis omitted.)); *United States v. Gil*, 297 F.3d 93, 104 (2d Cir. 2002); *Bradley v. Nagle*, 212 F.3d 559, 567 (11th Cir. 2000); *United States v. Phillip*, 948 F.2d 241, 249 (6th Cir. 1991); see also *United States v. Morales*, 746 F.3d 310, 315 (7th Cir. 2014). But see *Hoke v. Netherland*, 92 F.3d 1350 (4th Cir. 1996).

¶ 48    Here, while the statements about Harkey in the Kroll letter may have been inadmissible hearsay, the Kroll letter led to the discovery of admissible evidence—namely, Harkey's testimony regarding his disagreements with SBS. Bretz testified that if he had received the Kroll letter in discovery, he would have attempted to interview Harkey regarding his doubts about SBS, both in I.Z.'s case and in general. Had Bretz interviewed Harkey on these subjects, he would have discovered Harkey's general disagreements with SBS.

¶ 49    We find that Harkey's testimony in the federal *habeas corpus* proceedings and at the evidentiary hearing was material evidence for *Brady* purposes because it " 'could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict.' " *Coleman*, 183 Ill. 2d at 393 (quoting *Kyles*, 514 U.S. at 435). The State's theory of the case at I.Z.'s trial was that the defendant shook I.Z. violently, which immediately caused I.Z. to collapse. Under the State's theory, the defendant was the perpetrator because she was the only adult with I.Z. at the time I.Z. collapsed. The defendant did not confess to the offense and there were no eyewitnesses. Rather, the State's theory was based almost entirely on Flaherty's expert testimony regarding SBS and AHT. While Harkey's limited testimony at the defendant's trial did not contradict Flaherty's testimony, his testimony at the federal *habeas corpus* hearing and the postconviction evidentiary hearing undercut Flaherty's trial testimony in several significant ways.

¶ 50    Harkey testified at the federal hearing that, although he could not recall expressing doubts about the SBS diagnosis in I.Z.'s case, he had disagreements with SBS in general at the time of I.Z.'s trial. Specifically, Harkey testified that all the injuries attributed to shaking in SBS cases could also be caused by blunt force trauma. Thus, Harkey opined, one could not tell from a child's injuries alone whether the child was shaken or hit. This testimony contradicted Flaherty's testimony that I.Z.'s injuries could only have been caused by acceleration/deceleration forces like shaking. While Flaherty noted that AHT could result from injuries other than shaking, she said that shaking was the most common. Flaherty repeatedly gave the example of shaking throughout her testimony and used the terms AHT and SBS virtually interchangeably.

¶ 51    Moreover, Harkey testified that he disagreed with SBS as it related to the ability to pinpoint a perpetrator. Harkey stated that, depending on the type of injury, a child could go unresponsive at a time remote from the actual injury. Harkey opined that, based on the injury alone, one could not divine that a baby went unresponsive immediately after being shaken as opposed to collapsing from "blunt trauma that may have occurred earlier." Harkey testified that, had he been asked at the defendant's trial, he would have disagreed that the defendant must have been the perpetrator because she was the last adult to be with I.Z. before she collapsed. This contradicted Flaherty's testimony that the effect of I.Z.'s injuries could have only been caused by acceleration/deceleration forces like shaking and that the effect of the injuries would have been immediate.

¶ 52    Additionally, Harkey's testimony that it was possible for an infant with subdural hematomas, retinal hemorrhages, and brain swelling to drink milk from a bottle before collapsing undercut Flaherty's testimony that the fact that I.Z. ate normally in the morning on the day she collapsed showed that her brain injury had not yet occurred. It also bolstered Tucker's testimony that the fact that I.Z. took a bottle the morning she collapsed did not rule out the possibility that she was already experiencing problems at that time.

¶ 53    We reemphasize that the defendant did not confess to the offense and there were no eyewitnesses to the alleged abuse in this case. The State's theory that the defendant was the perpetrator was based almost entirely on Flaherty's expert testimony that I.Z.'s injuries were caused by someone of adult strength shaking her and that the injuries were immediate. Under these circumstances, we find that Harkey's testimony concerning his disagreement with SBS, which contradicts significant aspects of Flaherty's testimony, " ' could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict.' " *Coleman*, 183 Ill. 2d at 393 (quoting *Kyles*, 514 U.S. at 435). Thus, we find that the circuit court's decision, granting the successive postconviction petition, was not manifestly erroneous, as the opposite conclusion was not clearly evident. See *Coleman*, 2013 IL 113307, ¶ 98.

¶ 54    We reject the State's contention that Harkey's testimony regarding his disagreement with SBS would not change the outcome because there was testimony, other than Flaherty's testimony, indicating that I.Z. was abused. In support of this proposition, the State cites to the testimony of Nica and Hast. While Nica and Hast testified that they believed I.Z. was shaken or abused, neither gave an opinion as to the timing of I.Z.'s injuries. Only Flaherty testified that the injury must have been immediate. Also, Nica's testimony regarding his opinion that I.Z. suffered abuse was not admitted for the truth of the matter asserted. The significance of Harkey's testimony at the federal *habeas corpus* hearing and postconviction evidentiary

hearing was not that it ruled out the possibility that I.Z. was shaken or otherwise abused. Rather, the significance of Harkey's testimony was that it cast doubt on the ability to determine how and when I.Z. was injured based on her injuries alone.

¶ 55 We also reject the State's argument that Bretz should have interviewed Harkey and discussed Harkey's beliefs regarding SBS even without the disclosure of the Kroll letter. The fact that Bretz might have discovered the information contained in the Kroll letter if he had interviewed Harkey does not excuse the State's failure to turn over favorable evidence to the defendant.

¶ 56 Because we affirm the judgment of the circuit court on the basis of the defendant's *Brady* claim, we need not address the defendant's actual innocence claim. As such, we do not address Harkey's testimony regarding I.Z.'s chronic subdural hematoma, as that testimony related to the defendant's actual innocence claim. The defendant will have the opportunity to present such evidence at her new trial.

¶ 57                                                        CONCLUSION
¶ 58 The judgment of the circuit court of Will County is affirmed.

¶ 59 Affirmed.